UNITED STATES of America,
Plaintiff–Appellee,

v.

Alfred Gene BRIDGES, Defendant–
Appellant.

No. 01–30316.

United States Court of Appeals,
Ninth Circuit.

Argued and Submitted April 11, 2003.

Filed Sept. 24, 2003.

Robert Stephens, Jr., Billings, MT, for the defendant-appellant.

James Seykora, Assistant United States Attorney, Billings, MT, for the plaintiff-appellee.

Before D.W. NELSON, THOMAS, Circuit Judges, and PREGERSON, District Judge.**

Opinion by Judge D.W. NELSON; Partial Concurrence and Partial Dissent by Judge THOMAS.

**OPINION**

D.W. NELSON, Senior Circuit Judge.

Alfred Bridges appeals his conviction following a jury trial for conspiracy to defraud the United States, making false claims to the United States, and mail fraud. Bridges contends that the district court erred in denying his motion to suppress evidence that was seized by the Government with an invalid search warrant. Bridges also challenges the district court's conviction and judgment because the Government allegedly violated his rights under

** The Honorable Dean D. Pregerson, United States District Judge for the Central District of California, sitting by designation.

the Due Process clause by applying a "secret" policy to him in violation of the Taxpayer Bill of Rights. Lastly, Bridges claims that the district court's instructions to the jury were deficient. We have jurisdiction pursuant to 28 U.S.C. § 1291. We agree with Bridges that the search warrant was invalid and excessively broad in its scope. Bridges's Due Process claim is without merit, and we decline to reach the issue of the adequacy of the challenged jury instructions. Accordingly, Bridges's conviction is vacated and we remand to the district court for a new trial.

### I. Factual and Procedural Background

Bridges operated a tax consulting business, Associated Tax Consultants ("ATC"), in Billings, Montana. Between 1997 and 2000, ATC generated $679,260.11 in revenue from its tax consulting business with more than 300 clients in thirty states. ATC advised its clients not to pay federal income taxes. According to ATC, residents of the United States are not liable for federal income taxes if they declare that they are "non-resident aliens."

Agents of the IRS's Criminal Investigation Division ("CID") launched an undercover investigation into ATC's operations in 1998. Undercover Treasury agents posing as prospective clients of ATC visited ATC's offices in 1999 and 2000. Bridges met with an undercover Treasury agent at ATC's offices for the first time in April 1999. Bridges advised the agent that he could avoid paying federal taxes if he declared to the IRS that he was a "non-resident alien." Bridges stated, "Once you become a client [of ATC], the point of the whole thing is not to pay [the IRS]."

From 1997 to 2000, ATC filed more than 100 claims with the IRS requesting tax refunds on behalf of its "non-resident alien" clients. On at least ten occasions, the IRS responded to ATC's claims with a form letter denying the claim and advising claimants that:

> There are people who encourage others to deliberately violate our nation's tax laws. It would be unfortunate if you were to rely on their opinions. These persons take legal statements out of context and claim that they are not subject to tax laws.... Taxpayers who purchase this kind of information often wind up paying more in taxes, interest, and penalties than they would have paid simply by filing correct tax returns.

On no occasion did the IRS ever grant any of ATC's requests for a taxpayer refund.

The IRS obtained a search warrant from the district court to search ATC's offices in Billings. On January 13, 2000, Treasury agents executed the warrant and searched Bridges's offices located at 3021 6th Avenue North. The agents seized ATC's computer system, client files, tax codes, correspondence from ATC's clients, ATC's seminar videos, and other business documents and equipment found on the premises.

On March 10, 2000, Bridges requested that the IRS produce a copy of the Application and Affidavit for Search Warrant it filed in district court and return the items seized from his office. Bridges's request was denied by the district court. Bridges appealed. Before this Court could rule on his appeal, a federal grand jury in Montana indicted Bridges. This Court subsequently dismissed Bridges's appeal in a published opinion. *See In re 3021 6th Ave. N., Billings, MT*, 237 F.3d 1039 (9th Cir. 2001) (finding that the district court's intervening indictment of Bridges caused this Court to lose jurisdiction over his appeal).

In August 2000, Bridges moved to suppress the items seized from ATC's offices, to have his property returned, and to dis-

miss the indictment. Bridges's motions were denied by the district court and the action proceeded to trial. In April 2001, a jury returned a verdict in favor of the Government, convicting Bridges of forty-one of the forty-four counts charged against him.

Bridges was sentenced to fifty-seven months imprisonment and three years supervised release.

## II. Standard of Review

■■■ Motions to suppress are reviewed de novo. *See United States v. Jones,* 286 F.3d 1146, 1150 (9th Cir.2002). The issuance of a search warrant by a magistrate judge is reviewed for clear error. *See United States v. Wright,* 215 F.3d 1020, 1025 (9th Cir.2000). Motions to dismiss an indictment based on improper or outrageous Government conduct are reviewed de novo. *United States v. Lazarevich,* 147 F.3d 1061, 1065 (9th Cir.1998). The district court's ruling on a Rule 29 motion for acquittal is also reviewed de novo. *See United States v. Ruiz–Lopez,* 234 F.3d 445, 447 (9th Cir.2001).

## III. Discussion

### A. Fourth Amendment Claim

■■■ The Fourth Amendment states in pertinent part that, "The right of the people to be secure in their persons, houses, papers, and effects, against unreasonable searches and seizures, shall not be violated, and no Warrants shall issue, but upon probable cause." U.S. Const. amend. IV. "These words are precise and clear." *Stanford v. Texas,* 379 U.S. 476, 85 S.Ct.

506, 13 L.Ed.2d 431 (1965). "It is familiar history that indiscriminate searches and seizures conducted under the authority of 'general warrants' were the immediate evils that motivated the framing and adoption of the Fourth Amendment." *Payton v. New York,* 445 U.S. 573, 583, 100 S.Ct. 1371, 63 L.Ed.2d 639 (1980) (footnote omitted).[1] "The Amendment is to be liberally construed and all owe the duty of vigilance for its effective enforcement lest there shall be impairment of the rights for the protection of which it was adopted." *Go–Bart Importing Co. v. United States,* 282 U.S. 344, 357, 51 S.Ct. 153, 75 L.Ed. 374 (1931).

### 1. The Government possessed probable cause to search ATC's offices.

■■■ In *Illinois v. Gates,* 462 U.S. 213, 238–39, 103 S.Ct. 2317, 76 L.Ed.2d 527 (1983), the Supreme Court

> [R]eaffirm[ed] the totality-of-the-circumstances analysis that traditionally has informed probable-cause determinations. The task of the issuing magistrate is simply to make a practical, common-sense decision whether, given all the circumstances set forth in the affidavit before him ... there is a fair probability that contraband or evidence of a crime will be found in a particular place. And the duty of a reviewing court is simply to ensure that the magistrate had a substantial basis for ... conclu[ding] that probable cause existed.

*Id.* at 238, 103 S.Ct. 2317 (internal quotation marks and citations omitted). Probable cause "means less than evidence which

---

1. General warrants, known as writs of assistance in colonial America, granted officers of the English Crown blanket authorization to search wherever they pleased for goods imported in violation of British tax laws. *Stanford,* 379 U.S. at 481, 85 S.Ct. 506. The Supreme Court explained that, "They were

denounced by James Otis as 'the worst instrument of arbitrary power, the most destructive of English liberty, and the fundamental principles of law, that ever was found in an English law book,' because they placed 'the liberty of every man in the hands of every petty officer.' " *Id.* (citation omitted).

would justify condemnation, and ... may rest upon evidence which is not legally competent in a criminal trial." *United States v. Ventresca,* 380 U.S. 102, 107, 85 S.Ct. 741, 13 L.Ed.2d 684 (1965) (internal quotation marks and citations omitted).

In the case at bar, the Government's application for a search warrant was supported by the affidavit (the "Affidavit") of IRS Special Agent Loretta Rodriguez. The Affidavit, which is twenty-five pages long, sets forth in great detail the Government's bases for requesting a warrant and, specifically, outlines the Government's allegations against ATC and Bridges. In the Affidavit, Agent Rodriguez claims that Bridges and ATC manufactured false documents, evaded paying federal income taxes, filed fraudulent claims with the IRS, obstructed or impeded the Government's lawful administration of Title 26, conspired to defraud the United States, and engaged in multiple counts of mail fraud.

We find that Agent Rodriguez's Affidavit is more than sufficient to demonstrate probable cause. As noted by the Supreme Court, "an affidavit may be based on hearsay information and need not reflect the direct personal observations of the affiant, so long as the magistrate is informed of some of the underlying circumstances supporting the affiant's conclusions...." *Ventresca,* 380 U.S. at 108, 85 S.Ct. 741 (internal quotation marks and citations omitted). Here, Agent Rodriguez's allegations were premised on evidence obtained by federal agents who met Bridges and several other ATC personnel, complaints received from former ATC clients, a videotape of Bridges actually explaining his illegal tax strategies, and correspondence to the IRS from ATC executing the fraudulent scheme.

Specifically, the Affidavit substantiates its claims with the statements of undercover Treasury agents who interacted with ATC and Bridges. For instance, (1) the IRS office in Missoula, Montana, received a letter from Bridges stating that his client Donn Dugan, a resident of Montana, was a non-resident alien of the United States; (2) an undercover Treasury agent attended a seminar at ATC's offices, where he was played a videotape of Bridges explaining how his illegal scheme worked; (3) an undercover agent posing as an interested client met with Bridges in Billings, paid him $2,100 in fees, and was advised by him that he would never have to pay federal income taxes again; and (4) two undercover agents, again posing as prospective clients, met with ATC employee Terry Alderson, Bridges's son-in-law, at ATC's offices and were told that as non-resident aliens, they did not have to pay federal income taxes.

The Affidavit also cites to several former ATC clients. Many of them alleged that Bridges deceived them into believing that they owed no federal taxes. These clients included Mark Karlin of Colorado, Dave Johnston of Florida, and an unidentified resident of Billings.

Lastly, Agent Rodriguez's Affidavit summarizes the contents of eleven different letters from ATC that were received by IRS offices throughout the country on behalf of various ATC clients. The letters from ATC to the IRS explained that ATC's clients were non-resident aliens and, therefore, not liable for the payment of federal income taxes.

In this case, there is little doubt that the Government set forth sufficient facts before the district court to demonstrate probable cause.

2. *The scope of the warrant was overly broad.*

The Fourth Amendment requires that a search warrant "particularly describ[e] the

place to be searched, and the persons or things to be seized." U.S. Const. amend. IV. "This particularity requirement makes 'general searches under [a warrant] impossible and prevents the seizure of one thing under a warrant describing another. As to what is to be taken, nothing is left to the discretion of the officer executing the warrant.'" *United States v. Cardwell,* 680 F.2d 75, 77 (9th Cir.1982) (quoting *Marron v. United States,* 275 U.S. 192, 196, 48 S.Ct. 74, 72 L.Ed. 231 (1927)). ·

In *Boyd v. United States,* 116 U.S. 616, 630–31, 6 S.Ct. 524, 29 L.Ed. 746 (1886), the Supreme Court quoted the historic opinion of Lord Camden in *Entick v. Carrington,* which held that the Crown's use of general warrants to seize the personal property and papers of its subjects was illegal and devoid of any basis in law. 116 U.S. at 624–30, 6 S.Ct. 524. Lord Camden explained,

> Papers are the owner's goods and chattels; they are his dearest property; and are so far from enduring a seizure, that they will hardly bear an inspection; and through the eye cannot by the laws of England be guilty of a trespass, yet where private papers are removed and erried away the secret nature of those goods will be an aggravation of the trespass, and demand more considerable damages in that respect. Where is the written law that gives any magistrate such a 'power? I can safely answer, there is none; and, therefore, it is too much for us, without such authority, to pronounce a practice legal which would be subversive of all the comforts of society.

*Entick v. Carrington,* 19 How. St. Tr. 1029, 1066 (1765).

Similarly, in our own system of constitutional jurisprudence, we require that search warrants be reasonably specific in describing what is to be seized from a person's home or office. Hence, "[t]o determine whether a warrant lacks sufficient specificity, we must examine both the warrant's particularity and its breadth." *United States v. Kow,* 58 F.3d 423, 426 (9th Cir.1995). Yet, "[w]hile a search warrant must describe items to be seized with particularity sufficient to prevent a general, exploratory rummaging in a person's belongings, it need only be reasonably specific, rather than elaborately detailed, and the specificity required varies depending on the circumstances of the case and the type of items involved." *United States v. Rude,* 88 F.3d 1538, 1551 (9th Cir.1996) (internal quotation marks and citations omitted). Bridges contends that the search warrant in this case was overly broad and was tantamount to a general warrant. We agree. In light of the expansive and open-ended language used in the search warrant to describe its purpose and scope, we hold that this warrant's failure to specify what criminal activity was being investigated, or suspected of having been perpetrated, renders its legitimacy constitutionally defective.

Search warrants, including this one, are fundamentally offensive to the underlying principles of the Fourth Amendment when they are so bountiful and expansive in their language that they constitute a virtual, all-encompassing dragnet of personal papers and property to be seized at the discretion of the State. *See Stanford,* 379 U.S. at 481, 85 S.Ct. 506 (the Fourth Amendment "reflect[s] the determination of those who wrote the Bill of Rights that the people of this new Nation should forever 'be secure in their persons, houses, papers, and effects' from intrusion and seizure by officers acting under the unbridled authority of a general warrant." (internal quotation marks omitted)); *see also Boyd,* 116 U.S. at 630–31, 6 S.Ct. 524. The Fourth Amendment requires search

warrants to state with reasonable particularity what items are being targeted for search or, alternatively, what criminal activity is suspected of having been perpetrated. *Marron v. United States*, 275 U.S. 192, 196, 48 S.Ct. 74, 72 L.Ed. 231 (1927). Otherwise, the officers charged with executing the search are left to speculate as to what is the underlying purpose or nature of the search. The executing officers must be able to identify from the face of the warrant, as well as any attached or expressly incorporated documents, what it is that they are being asked to search for and seize from the target property.

 The warrant in this case authorized federal officers to search for property that was concealed in a two-story brick building located at 3021 6th Avenue North in Billings. The specific items that the Government believed were concealed in ATC's offices were articulated on a separate document entitled Attachment B, which was attached to the warrant and incorporated by reference. Attachment B states in relevant part that:

> Based on the facts as presented in the Affidavit for Search Warrant, your Affiant has probable cause to believe that there exists, within the previously described premises ... evidence of crimes that includes but is not limited to:

> 1. a. Records and documents, or electronically stored information....
>
> b. Documents, contracts, or correspondence
>
> ....
>
> c. Records relating to clients/victims ... of [ATC]....
>
> * * *
>
> 3. a. Computer hardware....
>
> b. Computer software....
>
> c. Computer-related documentation....

> d. Computer passwords and other data security devices....
>
> 4. Telephone toll records....
>
> 5. All fax machines....
>
> 6. All telephone answering machine outgoing message cassettes and incoming message cassettes.
>
> 7. All records, documents, and photographs establishing the person ... owning or leasing 3021 6th Avenue North....
>
> 8. Typewriter ribbons.
>
> 9. Phone numbers contained in the memory of an automatic telephone dialer, and phone numbers which can be retrieved from a Caller ID box.
>
> 10. Cash
>
> 11. Notary seals....
>
> 12. Postal meter or records of outgoing or incoming mailings/shippings....
>
> 13. Unopened mail....

Although the list of items and categories of property set forth in Attachment B is detailed, the list is so expansive that its language authorizes the Government to seize almost all of ATC's property, papers, and office equipment in Billings. The list is a comprehensive laundry list of sundry goods and inventory that one would readily expect to discover in any small or medium-sized business in the United States. In fact, other than Attachment B and the warrant's description of the location of ATC's offices, the warrant delineates no clear material limitation or boundary as to its scope.

The wording of this warrant is unquestionably broad in terms of describing what items the federal agents are being asked to seize. In its section entitled "Items to be Seized," the warrant authorizes the seizure of all records relating to clients or victims "including *but not limited to* " (emphasis added) the ones listed on the war-

rant. If, however, the scope of the warrant is "not limited to" the specific records listed on the warrant, it is unclear what is its precise scope or what exactly it is that the agents are expected to be looking for during the search.

### 3. The warrant failed to state what criminal activity was being investigated by the IRS.

■■■ Although we have "criticized repeatedly the failure to describe in a warrant the specific criminal activity suspected [by the Government]," *Kow*, 58 F.3d at 427, the warrant at issue in this case does not state what criminal activity is being investigated by the IRS. In *Kow*, we found that a warrant's reference to "fraudulent" transactions and possible disparities between actual and reported income is not sufficient to withstand constitutional muster. *Id.* Similarly in *Center Art Galleries–Haw., Inc. v. United States*, 875 F.2d 747 (9th Cir.1989) *abrogated on other grounds*, *J.B. Manning Corp. v. United States*, 86 F.3d 926, 927 (9th Cir.1996), we held that a "warrant['s] provision for the almost unrestricted seizure of items which are 'evidence of violations of federal criminal law' without describing the specific crimes suspected is constitutionally inadequate." *Id.* at 750. Such warrants are suspect because "[n]othing on the face of the warrant tells the searching officers for what crime the search is being undertaken." *United States v. George*, 975 F.2d 72, 76 (2d Cir. 1992).

Similarly, this warrant does not describe or allege the fraudulent activities that ATC and Bridges are suspected of having committed. The closest the search warrant comes to any allegation of criminal conduct is its reference to Agent Rodriguez's Affidavit. While the Affidavit sets forth what crimes Bridges and ATC are alleged to have committed, the warrant neither incor-

porates the Affidavit by reference, nor is a copy of the Affidavit physically attached to the warrant or any of its incorporated parts. *See Kow*, 58 F.3d at 429 n. 3 ("An affidavit providing more guidance than an overbroad warrant may cure the warrant's overbreadth only if (1) the warrant expressly incorporated the affidavit by reference and (2) the affidavit either is attached physically to the warrant or at least accompanies the warrant while agents execute the search."). With respect to describing what items are to be seized or the purpose of the search, the warrant refers the reader to Attachment B. Attachment B, however, does not make any specific allegation of criminal conduct. It merely refers to "crimes" in general. In fact, when Bridges asked Agent Rodriguez to show him the Affidavit on the day of the search, she informed him that, "[he] had no legal right to [see the Affidavit]."

■■■ The Government's argument that its search warrant is valid because ATC's entire operation was permeated with fraud lacks merit. "A generalized seizure . . . may be justified if the Government establishes probable cause to believe that the entire business is merely a scheme to defraud or that all of the business's records are likely to evidence criminal activity." *Kow*, 58 F.3d at 427. In *Rude*, we explained that such a seizure may be justified if the Government's supporting affidavit made it clear that the target business's "central purpose was to serve as a front for defrauding" investors. *See Rude*, 88 F.3d at 1551. This, however, is not such a case. Here, the IRS did not allege in its application that ATC's operations were permeated with fraud. *See id.* at 428 (citing *Center Art*, 875 F.2d at 751 ("permeated with fraud" doctrine not applicable where the supporting affidavit "did not aver that evidence of [the alleged] fraud was inseparable from other[busi-

ness] documents or that [the business] was permeated with fraud.")). Similarly, Agent Rodriguez's Affidavit does not make it sufficiently clear that ATC's operations were entirely fraudulent in nature. Specifically, it is not clear to us whether or not the Government knew at the time it was making its application that ATC's operations were permeated with fraud. If that was the case, the Government should have made this clear to the district court, so that the district court could examine the Government's evidence with greater depth and fashion a sufficiently tailored warrant consistent with the principles of the Fourth Amendment. In this case, however, there is insufficient evidence in the record to justify the Government's claim ex post facto.

The Government cites *United States v. Lacy*, 119 F.3d 742 (9th Cir.1997), in support of its argument. In *Lacy*, this Court found that a warrant authorizing the seizure of a criminal defendant's entire computer system was valid because (1) the warrant "contained objective limits to help officers determine which items they could seize," and (2) it was not possible for the Government to describe the computer system in any greater detail. *Id.* at 746.

■ *Lacy*, however, is distinguishable. Here, the IRS's warrant did not contain objective limitations to guide the federal agents in searching ATC's offices, and the general warrant obtained by the IRS did not allege any specific criminal conduct even though details of such activity would have served to limit the scope of the warrant. "[G]eneric classifications in a warrant are acceptable only when a more precise description is not possible." *Cardwell*, 680 F.2d at 78 (internal quotation marks and citations omitted). Here, however, we note that while Agent Rodriguez's Affidavit alleged in great detail the crimes that were purportedly perpetrated by ATC in violation of various federal statutes, these details were excluded from the warrant. The specificity of Agent Rodriguez's Affidavit stands in stark contrast to the vague and open-ended language of the warrant and calls into serious question the Government's contention that it was impossible to specify with any greater particularity the scope of the search it intended to execute.

We reverse the district court's denial of Bridges's motion to suppress.

**B.** *The IRS did not violate Bridges's Due Process rights by utilizing secret policies or by violating the Taxpayer Bill of Rights.*

■ Bridges also contends that his conviction should be set aside because the IRS's investigation was executed in a deceptive and illegal manner. Specifically, Bridges asserts that the IRS's "secret" policy of diverting all of his filings to its CID and the IRS's violation of the Taxpayer Bill of Rights constitute impermissible deception and, therefore, his motion to dismiss or, alternatively, his motion for acquittal should have been granted.

Bridges cites *United States v. Robson*, 477 F.2d 13 (9th Cir.1973), *United States v. Peters*, 153 F.3d 445 (7th Cir.1998), and *United States v. Tweel*, 550 F.2d 297 (5th Cir.1977), in support of his appeal. Having reviewed these cases, however, none of the above citations justifies the reversal of his conviction. In fact, all of the above cases address a different procedural context. Specifically, they discuss various criminal defendants' motions to suppress evidence that allegedly were obtained by the IRS through civil audits in violation of the Fourth Amendment.

In *Robson*, for instance, this Court explained that, "the failure of an IRS agent ... to warn a taxpayer that[a civil] audit may have potential criminal ramifications

does not render the search unreasonable." 477 F.2d at 17–18. In *Tweel*, the Fifth Circuit concluded that in order to suppress evidence obtained by the IRS, the record "must disclose some affirmative misrepresentation to establish the existence of fraud, and the showing must be clear and convincing." 550 F.2d at 299. Similarly in *Peters*, the Seventh Circuit held that in order to have evidence suppressed, the "defendant must produce clear and convincing evidence that the agents affirmatively mislead [sic] him as to the true nature of their investigation." 153 F.3d at 451 (internal quotation marks and citations omitted).

■ Although it is true that the IRS automatically routed any documents Bridges attempted to file to the CID, this, on its own, does not constitute clear and convincing evidence of any actual deception or trickery on the part of the Government. *See Tweel*, 550 F.2d at 299. In fact, no affirmative representation was ever made by the IRS to Bridges. All of Bridges's filings and correspondence with the IRS were tendered to the Government voluntarily.

■ Furthermore, Bridges's claim that the IRS's alleged violation of the Taxpayer Bill of Rights entitles him to have his conviction vacated also fails. The Omnibus Taxpayer Bill of Rights, 26 U.S.C. § 7433, permits taxpayers to recover civil damages from the United States for unauthorized collection activities, such as when the IRS causes damage through reckless, intentional, or negligent disregard of the Internal Revenue Code or regulations. 26 U.S.C. § 7433. Nowhere, however, does the Taxpayer Bill of Rights authorize the suppression of evidence or the reversal of a criminal conviction. As noted by the Seventh Circuit in *Peters*, "the Taxpayer Bill of Rights contains no provision providing for suppression of … evidence as a remedy." 153 F.3d at 458 n. 19.

## IV. Conclusion

For the foregoing reasons, we RE-VERSE the denial of Bridges's motion to suppress, VACATE his conviction, and REMAND for a new trial. Although Bridges also appeals the district court's jury instructions, we decline to reach this issue as it is unnecessary in light of our determination that the district court erred in denying his motion to suppress and, hence, Bridges is entitled to a new trial.

REVERSED, VACATED and RE-MANDED.

THOMAS, Circuit Judge, concurring in part and dissenting in part.

I agree completely with the majority's thorough and excellent legal analysis. When the execution of a search warrant will likely result in the termination of a business, as occurred in this case, special care must be given to ensure that the scope of the warrant is not overly broad. I also agree that, if the government is relying upon the "permeated with fraud" exception to support an application for an otherwise overly-broad search warrant, it should state so in the application rather than attempting a post-hoc rationalization.

However, under the specific facts of this case, I cannot fault the district court's conclusion. If the affidavit is read in context and in its entirety, it establishes probable cause to believe that the "central purpose" of the business was to serve as a front for defrauding taxpayers. *See United States v. Rude*, 88 F.3d 1538, 1550 (9th Cir.1996) (permeated with fraud exception applied because it was clear from the affidavit that the business' "central purpose" was to serve as a front for defrauding investors); *United States v. The Offices Known as 50 State Distributing Co.*, 708

F.2d 1371, 1374 (9th Cir.1983) (permeated with fraud exception applied where affidavit evidenced pervasively fraudulent operation which encompassed entire business and all business-related books, records, and equipment).

Thus, despite the affidavit's infirmities, I conclude that the district court did not err in applying the "permeated with fraud" exception under the particular circumstances of this case. Therefore, I would affirm the judgment of conviction.