**UNITED STATES of America,
Plaintiff,**

v.

**John Sherwood HOLMES, Defendant.**

**No. CR 14–32–M–DLC.**

United States District Court,
D. Montana,
Missoula Division.

Signed Aug. 7, 2014.

Paulette L. Stewart, Office of the U.S. Attorney, Helena, MT, for Plaintiff.

Michael Donahoe, Federal Defenders of Montana, Helena, MT, for Defendant.

## ORDER

DANA L. CHRISTENSEN, District Judge.

Defendant John Sherwood Holmes has been indicted for possession of an unregistered silencer in violation of 26 U.S.C. §§ 5841 and 5861(d) ("Count I"), and possession of a firearm by a person previously convicted of a misdemeanor crime of domestic violence in violation of 18 U.S.C. § 922(g)(9) ("Count II"). Before the Court are the following motions filed by the Defendant, all of which are opposed by the Government: (1) motion to suppress the firearm that forms the basis of both Counts I and II; (2) motion in limine to exclude the recorded interviews of Defendant and two other individuals; (3) motion to dismiss Count II of the Indictment; and (4) motion to correct misjoinder and/or for severance as to Counts I and II. The Court grants the motion to suppress the firearm and denies the remaining motions as moot.

## I. Background

At the heart of this case is a silenced Ruger .22 caliber pistol discovered by detectives from the Missoula County Sheriff's Department ("MCSD") while executing a warrant issued by a State of Montana district court judge.

In March of 2013, the Missoula Police Department was investigating a series of break-ins to a dozen storage units at the Frenchtown Mini Storage facility. The perpetrators cut the locks off the storage unit doors and absconded with a number of items, which were detailed in the application for search warrant (Doc. 12–1). The majority of the missing items were fairly large (e.g., rifles, rocking chairs, chainsaws, and camping equipment), but the list did include several smaller items, including a silver fork set, "miscellaneous bolts and parts for pick-up," and "any tool to include bolt cutters which may have been used to cut the padlocks at the Frenchtown Mini–Storage." (Doc. 12–1 at 2.) On March 28, 2013, MCSD officers obtained information indicating that Dustyn Hess, Nathan Wiener, and Johnny Holmes, Jr. (the son of the Defendant) were involved with the break-ins, and that Hess was in possession of a shotgun stolen from the units, which he reportedly cut down and transformed into a "sawed-off" shotgun. MCSD officers performed a traffic stop on a vehicle driven by Hess, in which Wiener was riding as a passenger. Hess and Wiener confirmed that the shotgun had been "sawed-off," and that Hess had been in possession of the weapon earlier that day. The MCSD promptly recovered the shotgun, whose barrel measured 13 inches—5 inches shorter than the legal length under Montana law.

After waiving his *Miranda* rights Hess provided a recorded interview detailing his involvement with the break-ins, in which he stated that John Holmes, Jr. was also involved. Hess reported that all of the stolen items were immediately moved to the residence of John Sherwood Holmes, the Defendant in the instant action. In a recorded interview, Wiener denied his involvement but reported that Hess had informed him about the break-ins. Finally, as stated in Detective Jon Gunter's application for a search warrant, both Hess and Weiner "reported illegal drug activity at the Holmes residence, 2010 S. 14th. Street W. This information matches information reported to Detective McDermott, and to the Missoula Drug Task Force by confidential sources." (Doc. 12–1 at 7.)

In response to Gunter's sworn application, Montana District Court Judge Ed McLean issued a warrant to search the Holmes residence for a list of items reported missing from the storage units, as well as "Any illegal drugs to include but not limited to methamphetamine, cocaine, ecstasy, marijuana and any prescription medications present which are not properly packaged in original packaging" and "Any illegal drug paraphernalia." (*Id.* at 8–10.) Neither the warrant or the warrant application implied that the Defendant was involved in the burglaries, and the resulting search did not yield any of the items associated with those burglaries.

While executing the search warrant, Detective Stineford searched a gym bag located in a bedroom. Underneath a pair of gym shorts, Stineford found the .22 caliber Ruger that is the subject of both counts of the Indictment. Stineford removed the Ruger from the bag, conducted further inspection, and placed it in Detective Gunter's custody. Deputy Cochran recorded the Ruger on the property receipt. The Ruger was removed from the premises and John Sherwood Holmes was subsequently charged in this case.

## II. Motion to Suppress Evidence

### A. Probable Cause

Defendant contends that because the officers could not reasonably believe they were going to find any of the storage unit items in the gym bag, the only plausible reason for the search was to locate drugs or drug paraphernalia. Defendant argues that because the "illegal drug activity" described in the warrant application was too general, overbroad, and unsupported, the Court should strike that portion of the warrant for failure of probable cause, thereby rendering the search of the gym bag unconstitutional. The Court rejects this argument.

Before issuing a warrant, a judge is required "simply to make a practical, common-sense decision whether, given all the circumstances set forth in the affidavit before him, including the veracity and basis of knowledge of persons supplying hearsay information, there is a fair probability that contraband or evidence of a crime will be found in a particular place." *Illinois v. Gates*, 462 U.S. 213, 238, 103 S.Ct. 2317, 76 L.Ed.2d 527 (1983). Upon review, the issuing judge's ruling of probable cause should be upheld as long as that judge "had a substantial basis for concluding that a search would uncover evidence of wrongdoing." *Id.* at 236, 103 S.Ct. 2317. Probable cause "means less than evidence which would justify condemnation," and "may rest upon evidence which is not legally competent in a criminal trial." *United States v. Ventresca*, 380 U.S. 102, 107, 85 S.Ct. 741, 13 L.Ed.2d 684 (1965).

The warrant application provided a substantial basis for Judge McLean to conclude that the stolen storage unit items were located at Defendant's residence. As described above, the warrant included several items that a law enforcement officer could reasonably believe were small enough to fit in a gym bag, including miscellaneous pick-up truck parts, a silver fork set, and tools used for forcing entry. Moreover, the officers were aware that one of the firearms taken from the storage unit had been shortened, and thus had a reasonable basis to believe that other firearms contained in the warrant had been modified or disassembled, rendering them or their component parts small enough to fit into the gym bag. The warrant was sufficient to support the officers' search for the missing storage unit items, and it was entirely reasonable for them to believe some of those items may be located in the gym bag.

■ Although the Defendant did not initially take issue with the sufficiency of the warrant or the warrant application as to the stolen items, in his reply brief he contends that the application was deficient for failure to state with specificity where the stolen items were stored, stating only that they were transported to Defendant's residence. (Doc. 25 at 3.) Defendant relies heavily on *United States v. Bridges*, 344 F.3d 1010 (9th Cir.2003), to support his argument that the warrant was too general and overly broad. *Bridges* is distinguishable from the instant case, and does not support the Defendant's position. In that case, the Court addressed the sufficiency of both the warrant application and the warrant itself. As to the application, the Court held that the Government set forth sufficient facts to demonstrate probable cause. *Bridges*, 344 F.3d at 1015. However, the Court found that the warrant was "overly broad and ... tantamount to a general warrant," and held that "[i]n light of the expansive and open-ended language used in the search warrant to describe its purpose and scope ... [the] warrant's failure to specify what criminal activity was being investigated, or suspected of having been perpetrated, renders its legitimacy constitutionally defective." *Id.* at 1016.

■ Search warrants must be "reasonably specific in describing what is to be seized from a person's home." *Id.* at 1016. "While a search warrant must describe items to be seized with particularity sufficient to prevent a general, exploratory rummaging in a person's belongings, it need only be reasonably specific, rather than elaborately detailed, and the specificity required varies depending on the circumstance of the case and the type of items involved." *United States v. Rude*, 88 F.3d 1538, 1551 (9th Cir.1996) (internal quotation marks and citations omitted). In the alternative, the a warrant must state "what criminal activity is suspected of having been perpetrated." *Bridges*, 344 F.3d at 1017 (citing *Marron v. United States*, 275 U.S. 192, 196, 48 S.Ct. 74, 72 L.Ed. 231 (1927)). Put simply, a warrant must sufficiently articulate two elements: *where*, and either *what* or *why*. *See Maryland v. Garrison*, 480 U.S. 79, 84, 107 S.Ct. 1013, 94 L.Ed.2d 72 (1987) ("the scope of a lawful search is 'defined by the object of the search and the places in which there is probable cause to believe that it may be found'") (citing *United States v. Ross*, 456 U.S. 798, 824, 102 S.Ct. 2157, 72 L.Ed.2d 572 (1982)).

The *Bridges* warrant was deemed defective not because it failed to specify the premises to be searched, but because it was "unquestionably broad in terms of describing what items the federal agents are being asked to seize," and did not describe the criminal conduct that the defendant was suspected of having committed. *Id.* at 1017–18. The list of items sought was "so expansive" that it authorized the Government to seize "almost all of [Defendant's] property, papers, and office equipment." *Id.* at 1017. Additionally, the warrant was expressly "not limited to" the items listed therein, placing it even further beyond the bounds of what is constitutionally permissible. *Id.* Here, both the scope of warrant and the application supporting it were limited to a detailed list of specific items. The list was compiled based on reports of what items were missing from the storage units and Hess's statement as to what items were taken. The warrant was reasonably specific in its description of what was to be seized, and thus properly limited in scope. *See Bridges*, 344 F.3d at 1016 ("we require that search warrants be reasonably specific in describing what is to be seized from a person's home or office").

Here, Defendant anchors his argument on the "where." The *Bridges* warrant de-

scribed the location to be searched as a two-story brick building located at 3021 6th Avenue North in Billings. The Court implicitly found this description sufficient. *Id.* at 1017 ("The list [of items and categories of property set forth in the warrant] is a comprehensive laundry list of sundry goods and inventory that one would readily expect to discover in any small or medium-sized business.... *Other than the warrant's description of the location of [defendant's] offices, the warrant delineates no clear material limitation or boundary as to its scope* " (emphasis added)). The warrant at issue here contains greater detail as to the location to be searched, (Doc. 12–1 at 1–2), and is based on Hess's statement that the items were transported to the Defendant's residence, and that he had seen one of the items in the Defendant's garage one month before the warrant application was filed. Hess's statement is sufficient to create a "fair probability" that some or all of the missing items will be found at the Defendant's residence. *Gates,* 462 U.S. at 238, 103 S.Ct. 2317. Furthermore, given the number and variety of the missing items, Judge McLean had a substantial basis from which to conclude that a search of the entire premises was necessary. In this situation, neither the warrant nor the warrant application required further detail about the specific rooms to be searched.

The warrant and the underlying application were sufficiently detailed and limited in scope as to the location to be searched and the missing storage unit items to be seized. While Stineford does not state whether he was searching the gym bag for drugs or for stolen items, it is entirely plausible that several of the stolen items may be contained therein. Thus, even if the Court was to strike the illegal drug language, the officers' actions fall squarely within the parameters of the warrant. Accordingly, the Court rejects Defendant's motion as to probable cause without addressing the sufficiency of the "illegal drug activity" allegation.

## B. Seizure of the Ruger

 "It is well established that under certain circumstances the police may seize evidence in plain view without a warrant." *Coolidge v. New Hampshire,* 403 U.S. 443, 465, 91 S.Ct. 2022, 29 L.Ed.2d 564 (1971). Because the Ruger was not included in the warrant—nor does it resemble any of the firearms listed in the warrant, all of which were long guns—the Government relies on the "plain view" doctrine to support its argument that its seizure was constitutionally sound. In order for Stineford's seizure to fall under the plain view exception: (1) the gun must have been in plain view, (2) Stineford must have had a lawful right of access to the gun itself, and (3) the gun's incriminating character must have been readily apparent. *Horton v. California,* 496 U.S. 128, 136–37, 110 S.Ct. 2301, 110 L.Ed.2d 112 (1990). Probable cause is required in order for the government to properly invoke the plain view doctrine. *Arizona v. Hicks,* 480 U.S. 321, 326, 107 S.Ct. 1149, 94 L.Ed.2d 347 (1987).

"An example of the applicability of the plain view doctrine is the situation in which the police have a warrant to search a given area for specified objects, and in the course of the search come across some other article of incriminating character." *Coolidge,* 403 U.S. at 465, 91 S.Ct. 2022. As described herein, the warrant was constitutionally sound, and Detective Stineford's search of the gym bag was appropriate and consistent with the terms of the warrant. Thus, the first two prongs of the test articulated in *Horton* are satisfied here, and the Court turns to whether the gun's "incriminating character" was "im-

mediately apparent." *Horton,* 496 U.S. at 136, 110 S.Ct. 2301.

As Defendant correctly claims, there is no indication that the modified Ruger was *per se* illegal. Stineford tacitly acknowledged this in his Case Report, stating that Ruger pistols "could be legally modified to be integrally suppressed." (Doc. 12–1 at 13.) Thus, based on the Indictment, the Ruger's specific "incriminating character" could be either that (1) it constituted an unregistered silencer, or (2) it was in the possession of a person who, due to a pervious conviction of a domestic violence crime, was precluded from possessing firearms under federal law. Defendant is also correct that at the time of discovery and seizure the officers had no indication that the silenced Ruger was unregistered. Stineford represents that there was no paperwork with the pistol, (Doc. 12–1 at 14), but the government presents no argument as to how a silenced pistol stored without the registration paperwork constitutes an immediately apparent violation of the statute proscribing unregistered silencers. While it was clear that the Ruger had been silenced, Stineford had no reliable basis—much less one that was immediately apparent—from which to conclude that the silencer was unregistered. The Court

does not consider the lack of paperwork with the Ruger to be significant. Most gun owners do not have paperwork affixed or attached to, or near their firearms.

■ The Court must now evaluate whether the government's claim that the Ruger's incriminating character was readily apparent based on the Defendant's previous conviction for misdemeanor domestic violence.[1]

■ An item's incriminating character is not determined solely by the item in isolation, but in the context of the surrounding circumstances. *United States v. Brinkerhoff,* 404 Fed.Appx. 147, 149 (9th Cir.2010) (not selected for publication in the Federal Register); *see, e.g. Texas v. Brown,* 460 U.S. 730, 741–43, 103 S.Ct. 1535, 75 L.Ed.2d 502 (1983); *United States v. Guy,* 903 F.2d 1240, 1243 (9th Cir.1990) ("The presence of the safe was indicative of narcotics activity when considered with the other evidence known to the officers-Barnes' personal possession of $670 in currency, mostly in 20's (the street price for a unit of 'crack'), a price list for 'crack,' and a receipt for the safe and instructions for its use; and the presence of the gram scale on top of the safe and the shotgun on the floor in front of the safe").[2] Here, the

---

1. To the extent Defendant is conflating the Indictment and the incriminating characteristics of the Ruger, and thus claiming that each Count in the Indictment must be supported by probable cause at the time of the seizure, the Court finds such an argument unsupported by the law and contrary to common and accepted practices. As long as probable cause of an incriminating characteristic existed at the time of the seizure, the Government is not precluded from bringing other charges against a defendant based on information gained following the seizure.

2. *Horton* implicitly supports the proposition that the immediately apparent standard is not limited to the item itself. Following the investigation of an armed robbery, a police offi-

cer determined that probable cause existed to search petitioner's home for the proceeds of the robbery and for the weapons used by the robbers. The officers affidavit for a search warrant described both the weapons and the proceeds, but the warrant itself only authorized a search for the proceeds and made no mention of the weapons. While executing the warrant, the officer discovered the weapons in plain view and seized them based on probable cause that they had been used in the crime he was investigating. The Court found that "[w]hen the weapons were discovered, it was immediately apparent to the officer that they constituted incriminating evidence. He had probable cause ... to believe that the weapons and handguns had been used in the crime he was investigating," and held that the

Government's position is that because the officers knew that the Defendant was prohibited from possessing a firearm, the Ruger's incriminating character was readily apparent. This assertion and the surrounding facts, however, warrant a closer and more detailed consideration. This is particularly true in light of the fact that the Ruger did not resemble any item listed in the warrant, its incriminating character is wholly unrelated to the break-ins for which the warrant was issued, and the Defendant was not implicated in the break-ins.

Stineford's Case Report ("Report") describes two actions which may arguably constitute seizures. First, after it became "immediately apparent to Stineford that th[e] pistol appeared to be suppressed," he removed the pistol from the bag for further inspection. (Doc. 12–1 at 13.) Next, after a thorough inspection and running the serial number, which returned clean, Stineford "allowed Detective Gunter to take custody of the pistol. Deputy Cochran recorded these items on the property receipt." (Id.) The parties do not split hairs regarding the precise moment of seizure and neither shall the Court, which will regard the latter and more invasive action as the operative seizure. The Report continues: "Detective Stineford also conferred with MPD Sgt. McLean who was familiar with Holmes Criminal History. Sgt. McLean reported to Detective Stineford that he knew that Holmes had a misdemeanor conviction for PFMA and was therefore prohibited from possessing a firearm." (Id.) Although the Report does not state at precisely what point Stineford spoke to McLean and learned about the

conviction, the chronological nature of the Report and the fact that Stineford makes no mention of any knowledge or suspicion of Defendant's status until after he described Gunter taking possession of the Ruger and Cochran recording it on the property receipt supports the conclusion that neither Stineford—nor Gunter or Cochran, for that matter—knew or had reason to know that Defendant was prohibited from possessing a gun until after the seizure. This point is critical. Since the Ruger is not *per se* evidence of immediately apparent criminality, that requirement can only be satisfied by knowledge of Defendant's criminal history at the time of seizure.

A plain reading of the Report and the Government's response brief is devoid of any indication that Stineford knew of Defendant's criminal history, let alone that he relied on that history as the basis for determining that the Ruger was evidence of immediately apparent criminal activity. In fact, the Government's reliance on the collective knowledge doctrine, discussed at length below, implies that the seizing officers did not possess the requisite knowledge until after they seized the Ruger; if they had, there would be no need to raise the collective knowledge doctrine.

 The Government attempts to retroactively impute McLean's knowledge to the seizing officers through a creative application of the collective knowledge doctrine. (Doc. 23 at 7 ("Additionally, it is sufficient that the agents collectively knew that Holmes was a prohibited person." *United States v. Wells*, 98 F.3d 808, 810 (4th Cir.1996)); Doc. 23 at 3 ("It was also

seizure was authorized by the plain-view doctrine. *Horton*, 496 U.S. at 142, 110 S.Ct. 2301. Thus, the weapons' incriminating character was not inherent to the weapons themselves, but was instead tied to the officer's specific knowledge and the context of

this particular case; in other words, the same exact weapons discovered in plain view while executing a search warrant for evidence of tax fraud would not have the same immediately apparent incriminating character.

common knowledge among the present officer that Holmes was prohibited from owning a firearm because of his prior domestic violence conviction").) The collective knowledge doctrine, however, does not permit the Government to engage in this sort of backfilling in order to establish the that the Ruger's criminal nature was immediately apparent.

■ The collective knowledge doctrine permits courts "to impute police officers' collective knowledge to the officer conducting a stop, search, or arrest," and generally applies in two situations. *United States v. Villasenor*, 608 F.3d 467, 475 (9th Cir. 2010). The first is "where law enforcement agents are working together in an investigation but have not explicitly communicated the facts each has independently learned." *United States v. Ramirez*, 473 F.3d 1026, 1032 (9th Cir.2007). The second situation is "where an officer ... with direct personal knowledge of all the facts necessary to give rise to reasonable suspicion ... directs or requests that another officer ... conduct a stop, search or arrest." *Id.* at 1033. Critically, "in both situations, collective knowledge may be imputed only if there has been some 'communication among agents.' " *Villasenor*, 608 F.3d at 475 (quoting *Ramirez*, 473 F.3d at 1032).

The Court's research into the collective action doctrine reveals two critical underlying requirements that are fatally absent here. First, although McLean possessed knowledge of the Defendant's conviction, at no time prior to the seizure did he communicate that knowledge to the agents; nor did he order or request that his fellow officers seize the weapon without any further explanation—which alone would have been sufficient. *See Ramirez*, 473 F.3d at 1036 (holding that communication of *why* a suspect should be seized is not affirmatively required, and that reaf-

firming application of the collective knowledge doctrine in situations where the officer conducting the stop was only given a request containing only descriptions of the suspect, not the factual basis for the relaying officer's determination that probable cause existed); *United States v. Sutton*, 794 F.2d 1415, 1426 (9th Cir.1986) (explaining that the collective knowledge doctrine applies when an officer acts "based in part on information or directions from other law enforcement officials"); *United States v. Mayo*, 394 F.3d 1271, 1275 (9th Cir. 2005) (applying the collective knowledge doctrine where a police dispatcher notified an officer that he should "investigate suspicious activity," relaying only that directive and a description of the suspected vehicles involved). Closely related to the need for communication is the requirement of a causal link between the knowledge and the event in question, which the jurisprudence in this area tacitly requires. To this Court's knowledge, in all situations where a court has granted the government the benefit of the common knowledge doctrine, the search, stop, or seizure was made *in reliance* on the information that at least one officer did in fact possess. *See e.g. United States v. Burton*, 583 Fed. Appx. 812, 812, 2014 WL 3702860, *1 (9th Cir. July 28, 2014) ("The evidence the officers relied upon in stopping Burton's vehicle does not, individually or collectively, support a finding of reasonable suspicion"); *United States v. Jensen*, 425 F.3d 698, 704–05 (9th Cir.2005) (explaining that the doctrine "exists because, in light of the complexity of modern police work, the arresting officer cannot always be aware of every aspect of an investigation; sometimes his authority to arrest a suspect is *based on* facts known only to his superior or associates" (citations and internal quotation marks omitted)(emphasis added)). That is to say, the causal chain that lead directly to the event in question *began*

with the critical piece of information that properly gave rise to probable cause or reasonable suspicion.

The requirements of communication and reliance are illustrated perfectly in *United States v. Wells*, 98 F.3d 808 (4th Cir.1996), which is similar to the instant case in many respects, and which the Government cites to support its position. In *Wells*, Secret Service agents were lawfully searching the defendant's apartment pursuant to a warrant authorizing a search for evidence relating to bank fraud offenses. An agent spotted a weapon located in plain view in a place where the items listed in the warrant could reasonably have been found, and advised the other agents of the discovery. *Wells*, 98 F.3d at 810. The supervising agent ordered the firearm seized as evidence and the defendant was ultimately charged with unlawful possession of a firearm by a convicted felon. However, unlike in the instant case, the supervising agent who effected the seizure had conducted a criminal records review prior to the search through which he learned of the defendant's felony conviction. *Id.* at 809. Thus, the decision to seize the weapon was based directly on the knowledge of defendant's conviction. The Fourth Circuit determined that the doctrine applied and affirmed the district court's denial of defendant's motion to suppress.

Based on the need for communication and a causal link, one can imagine many slightly different factual scenarios under which the doctrine would potentially apply here. For example, McLean could have silently assisted with the seizure. Or perhaps he could have instructed Stineford over the radio to seize the weapon after learning of its discovery. However, the collective knowledge doctrine is not available under the facts as presented by Detective Stineford and the Government.

Any expansion of the doctrine to the type of situation presented here—where the knowledge was isolated in the mind of one of the investigating officers at the time of seizure and had zero bearing on the seizure itself—is both wholly unsupported by the law and repugnant to the Fourth Amendment.

Quite simply, at the time of seizure it was not immediately apparent to Stineford, Gunter, or Cochran that the Ruger was in the possession of an individual who was not lawfully entitled to possess it. They learned of Defendant's criminal history after the fact, and may not invoke the collective knowledge doctrine to apply that knowledge retroactively.

Because the Ruger's incriminating character was not immediately apparent to the officers at the time of its seizure, the plain view doctrine does not cover the officers' actions, and the Court will suppress the fruit of their illegal seizure. Since the Court will suppress this critical piece of evidence, it need not address Defendant's other motions, which will be denied as moot.

## III. Conclusion

For the reasons articulated herein,

IT IS ORDERED that the Defendant's motion to suppress the Ruger .22 LR Caliber pistol, Serial Number 16–15154 that forms the basis of Counts I and II of the Indictment is GRANTED.

IT IS FURTHER ORDERED that the Defendant's remaining pending motions (Docs. 13; 15; 17) are DENIED as moot.