**FOR PUBLICATION**

# UNITED STATES COURT OF APPEALS
# FOR THE NINTH CIRCUIT

UNITED STATES OF AMERICA,
            *Plaintiff-Appellant,*

            v.

SDI FUTURE HEALTH, INC.; TODD
STUART KAPLAN; JACK BRUNK,
            *Defendants-Appellees.*

No. 07-10261

D.C. No.
CR-05-00078-PMP

ORDER
AMENDING
OPINION AND
AMENDED
OPINION

Appeal from the United States District Court
for the District of Nevada
Philip M. Pro, District Judge, Presiding

Argued and Submitted
May 13, 2008—San Francisco, California

Filed January 27, 2009
Amended June 1, 2009

Before: Diarmuid F. O'Scannlain, Michael Daly Hawkins,
and M. Margaret McKeown, Circuit Judges.

Opinion by Judge O'Scannlain

6395

## COUNSEL

Robert L. Ellman, Appellate Chief, Office of the United States Attorney, Las Vegas, Nevada, argued the cause for the plaintiff-appellant and filed the briefs; Gregory A. Brower, United States Attorney, Las Vegas, Nevada, Steven W. Myhre, First Assistant United States Attorney, Las Vegas, Nevada, Michael Chu, Peter S. Levitt, Elizabeth A. Olson, Crane Pomerantz, and Roger W. Wenthe, Assistant United States Attorneys, Las Vegas, Nevada, were on the briefs.

Lance Etcheverry, Attorney, Skadden, Arps, Slate, Meagher & Flom LLP, argued the cause for the defendants-appellees; C. Stanley Hunterton, Hunterton & Associates, Thomas J. Nolan, Skadden, Arps, Slate, Meagher & Flom LLP, and Mark S. Hardiman, Hooper, Lundy & Bookman, Inc., filed the brief.

Albert Giang, Caldwell, Leslie & Proctor, P.C., Los Angeles, California, filed a brief on behalf of amicus curiae the American Civil Liberties Union of Nevada in support of defendants-appellees' petition for rehearing en banc. Andrew Esbenshade and Arwen Johnson, Caldwell, Leslie & Proctor, Los Angeles, California; and Allen Lichtenstein, American Civil Liberties Union of Nevada, Las Vegas, Nevada, were also on the brief.

Kevin P. Martin, Goodwin Procter LLP, Boston, Massachusetts, filed a brief on behalf of amicus curiae the National

Association of Criminal Defense Lawyers in support of defendants-appellees' petition for rehearing en banc. Sheryl McCloud, the National Association of Criminal Defense Lawyers, Seattle, Washington, was also on the brief.

Jason M. Skaggs, the Law Offices of Jason M. Skaggs, Palo Alto, California, filed a brief on behalf of amici curiae the Association of Corporate Counsel and the Chamber of Commerce of the United States of America in support of defendants-appellees' petition for rehearing en banc. Susan Hackett, the Association of Corporate Counsel, Washington, D.C.; and Robin S. Conrad and Amar D. Sarwal, the National Chamber Litigation Center, Inc., Washington, D.C., were also on the brief.

---

## ORDER

### I

The opinion filed in this case on January 27, 2009, is amended as follows.

At page 933 of the slip opinion, add the following counsel to the counsel list:

<Albert Giang, Caldwell, Leslie & Proctor, P.C., Los Angeles, California, filed a brief on behalf of amicus curiae the American Civil Liberties Union of Nevada in support of defendants-appellees' petition for rehearing en banc. Andrew Esbenshade and Arwen Johnson, Caldwell, Leslie & Proctor, Los Angeles, California; and Allen Lichtenstein, American Civil Liberties Union of Nevada, Las Vegas, Nevada, were also on the brief.

Kevin P. Martin, Goodwin Procter LLP, Boston, Massachusetts, filed a brief on behalf of amicus curiae the National

Association of Criminal Defense Lawyers in support of defendants-appellees' petition for rehearing en banc. Sheryl McCloud, the National Association of Criminal Defense Lawyers, Seattle, Washington, was also on the brief.

Jason M. Skaggs, the Law Offices of Jason M. Skaggs, Palo Alto, California, filed a brief on behalf of amici curiae the Association of Corporate Counsel and the Chamber of Commerce of the United States of America in support of defendants-appellees' petition for rehearing en banc. Susan Hackett, the Association of Corporate Counsel, Washington, D.C.; and Robin S. Conrad and Amar D. Sarwal, the National Chamber Litigation Center, Inc., Washington, D.C., were also on the brief.>

At page 943 of the slip opinion, line 17, after the citation <412 F.3d 1102, 1117 (9th Cir. 2005) (emphasis added).> add a new sentence reading <Thus, in *Gonzalez* we focused on the close control that the owner-operators exercised over their small business, which happened to be family-run.>

At page 943 of the slip opinion, delete the paragraph beginning <Kaplan and Brunk argue that> and replace with the following two paragraphs:

<Kaplan and Brunk argue that *Gonzalez* supports their claim of Fourth Amendment standing, but their argument rests on an overbroad reading of our opinion. We explicitly tied the defendants' standing to the "nature of the location." *Id.* at 1116. The defendants exercised, in the context of "a small, family-run business housing only 25 employees at its peak," "managerial control over [the] day-to-day operations" of the office where the conversations the wiretap "seized" took place, they owned the building where the office was located, and they not only could access the office but actually "exercised full access to the building." *Id.* at 1116-17. In our detailed factual analysis, therefore, we made clear that it does

not suffice for Fourth Amendment standing merely to own a business, to work in a building, or to manage an office.

The facts in this case place SDI in a gray area outside the particular facts of *Gonzalez*, because at most Kaplan and Brunk managed and worked in the office of a business of which they were, together, controlling shareholders. SDI's headquarters is twice the size of the office at issue in *Gonzalez*. The magistrate judge's findings of fact, which the district court adopted, emphasize primarily two aspects of the role Kaplan and Brunk played at SDI. First, the magistrate judge noted that Kaplan and Brunk owned and had authority to set policy at SDI. He also pointed out that, in their directorial capacities, they put in place significant security measures at SDI's headquarters. These facts show that SDI, through Kaplan and Brunk, took steps to protect the privacy of its headquarters. But the magistrate judge's findings do not show that Kaplan and Brunk personally managed the operation of the office on a daily basis, only that they set its general policy as officers of SDI. Because Kaplan and Brunk personally exercised less control over the premises in question than did the defendants in *Gonzalez*, that precedent does not control here.>

At page 943 of the slip opinion, line 38, replace <Though> with <Thus, although>

At page 945 of the slip opinion, line 10, delete <, family-run>

At page 949 of the slip opinion, line 9, delete footnote 9.

At page 949 of the slip opinion, immediately before Part III.A.2, insert a new paragraph and footnote as follows:

<The defendants argue that *Vesikuru* is distinguishable, because there we stated that "we learned at oral argument that in Washington State, contrary to the practice we usually see

in federal court, the issuing judge routinely attaches the supporting affidavit, or 'sworn complaint,' to the warrant, and that the issuing judge and the officers executing the warrant view the warrant and affidavit as one integrated document." *Vesikuru*, 314 F.3d at 1120. However, we do not read this passage as affecting the suitability of the words of reference. Although *Vesikuru* does not explicitly separate the two requirements, the passage is only logically applicable to the second prong of the *Kow* test, that "the affidavit either [be] attached physically to the warrant or at least accompan[y] the warrant while agents execute the search." 58 F.3d at 429 n.3.[1]>

At page 951 of the slip opinion, line 6, add a footnote at the end of the sentence ending <the affidavit fails.> The footnote should read <Of course, nothing in this opinion affects the *statutory* obligation of the searching agents to leave a copy of the warrant and a receipt for property taken with "the person

---

[1]Our opinion in *United States v. Bridges*, 344 F.3d 1010 (9th Cir. 2003), does not require a contrary result. In *Bridges*, an Attachment to the warrant mentioned the associated affidavit: "Based on the facts as presented in the Affidavit for Search Warrant. . . ." *Id.* at 1017. When later considering whether the affidavit could cure the warrant's failure to describe the specific criminal activity suspected by the government, the panel noted, without any discussion, that "the warrant neither incorporates the Affidavit by reference, nor is a copy of the Affidavit physically attached to the warrant or any of its incorporated parts." *Id.* at 1018. Because the affidavit also failed the second prong of *Kow* in that it was not attached to or did not accompany the warrant, any determination regarding incorporation was not necessary to the result in *Bridges*. Moreover, unlike *Vesikuru*, *Bridges* contains absolutely no discussion or analysis regarding suitable words of incorporation, perhaps because in *Bridges* it was an attachment to the warrant which referenced the affidavit rather than the warrant itself. We cannot know for sure because of the cursory nature of the conclusion that there was no incorporation. As we have explained, "not every statement of law in every opinion is binding on later panels. Where it is clear that a statement is made casually and without analysis . . . or where it is merely a prelude to another legal issue that commands the panel's full attention, it may be appropriate to re-visit the issue in a later case." *United States v. Johnson*, 256 F.3d 895, 915 (9th Cir. 2001) (en banc).

from whom, or from whose premises, the property was taken, or . . . [left] where the officer took the property." Fed. R. Crim. P. 41(f)(1)(C). Defendants did not raise Rule 41(f) in their brief on appeal.>

## II

The motions to become amicus curiae filed on February 27, 2009, by the National Association of Criminal Defense Lawyers, the Association of Corporate Counsel and Chamber of Commerce of the United States of America, and the American Civil Liberties Union of Nevada are, respectively, granted.

The panel has unanimously voted to deny the petition for rehearing and the petition for rehearing en banc. The full court has been advised of the petition for rehearing en banc and no active judge has requested a vote on whether to rehear the matter en banc. Fed. R. App. P. 35.

The petition for rehearing and the petition for rehearing en banc are DENIED. No further petitions for rehearing or rehearing en banc may be filed.

## **OPINION**

O'SCANNLAIN, Circuit Judge:

We must decide whether corporate executives may challenge a police search of company premises not reserved for the executives' exclusive use.

## I

## A

After a nearly two-year investigation spearheaded by the Internal Revenue Service ("IRS") with the participation of

four other federal and Nevada state agencies, investigators concluded that SDI Future Health, Inc. ("SDI"), a California corporation, had engaged in wide-ranging Medicare fraud. In addition, they believed that both SDI and Todd Stuart Kaplan, its president and part-owner, had committed extensive tax fraud. On January 28, 2002, based on the information obtained during the investigation, IRS Special Agent Julie Raftery applied for a warrant to search SDI's premises.

The warrant relied on an affidavit sworn by Raftery, which contained information she had learned from three former employees and two business associates of SDI.[1] The affidavit alleged that SDI, Kaplan and Jack Brunk, also an officer and part-owner of SDI, participated in a conspiracy with physicians and cardiac diagnostic companies to defraud the Medicare program, the Federal Employees Health Benefit Program, and private healthcare insurance carriers by seeking payment for services that SDI never rendered. According to the affidavit, they sometimes billed twice for such services and made kickback payments to physicians who participated in the scheme. It alleged specifically that SDI employees who were placed in participating doctors' offices would induce patients to participate in a sleep study. While cardiac diagnostic companies affiliated with SDI would purport to complete a report of the results of each sleep study, officers of SDI would instead affix a signature stamp bearing the signatures of staff physicians on reports that other SDI employees had actually completed. Referring physicians were instructed to bill for time spent reviewing the reports, a task the physicians never actually performed. Frequently, SDI would then recom-

---

[1]While this is an appeal from the district court's grant of the defendants' motion to suppress, the defendants also filed a motion for a *Franks* hearing, alleging that investigators engaged in material misrepresentations and omissions in obtaining the warrant. *See generally Franks v. Delaware*, 438 U.S. 154 (1978). After granting the defendants' motion to suppress in its entirety, the district court denied the *Franks* motion as moot. Accordingly, we presume that the factual allegations in the government's affidavit are true.

mend that a patient participate in further studies, usually in cases where the patient's health insurer would pay for them.

The affidavit also revealed incidents of alleged tax fraud. It noted that Kaplan and his wife reported negative gross income and, consequently, paid no taxes in the years 1996, 1998 and 1999, and reported relatively low income in 1997 and 2000. During the same period, however, the couple purchased several expensive automobiles and watercraft and supported a home mortgage. This discrepancy, according to the affidavit, provided the probable cause to support the investigators' belief that Kaplan and his wife substantially under-reported their gross income during those years. The government also alleged that SDI had violated federal tax laws by under-reporting its sales revenue and its income at least for the years 1996-2000.

The government submitted a proposed warrant with its affidavit. Appendix A of the warrant stated that the premises to be searched were SDI's corporate headquarters, principal business offices, and computers. Appendix B provided 24 categories of items to be seized and gave specific instructions concerning retrieving and handling of electronic data and other technical equipment.[2]

(Text continued on page 6408)

---

[2]The categories of items to be seized are as follows:

1. Documents relating to patient lists;

2. Documents relating to billing procedures, billing manuals, and billing materials;

3. Documents relating to lists of referring physicians both active and inactive;

4. Documents relating to billing records and records of payments received;

5. Documents relating to contracts or "purchase service agreements" with referring physicians;

6. Documents relating to contracts and agreements with cardiac diagnostic companies;

7. Documents relating to non-privileged correspondence with consultants;

8. Documents relating to correspondence with Medicare intermediaries and private insurance companies;

9. Documents relating to non-privileged internal memoranda and E-mail;

10. Documents relating to bank accounts, brokerage accounts, trusts;

11. Checking, savings, and money market account records including check registers, canceled checks, monthly statements, wire transfers, and cashier's checks;

12. Documents relating to personnel and payroll records;

13. Documents relating to accounting records;

14. Patient records including patient questionnaires, sleep study referrals, results of cardiac risk assessment tests, results of sleep studies, and sleep study reports;

15. Documents relating to raw sleep study data;

16. Documents relating to all state and federal income tax returns including personal, corporate, trust, estate, and partnership, and information relating to the preparation of those returns for the following: (a) Todd Stuart Kaplan, (b) Denise Kaplan, (c) SDI;

17. Signature stamps for Dr. Gavin Awerbuch, Dr. Susan Sprau, and any other physician signature stamps;

18. Computer zip discs containing sleep study data;

19. Documents relating to mailing or shipping records between physicians and SDI;

20. Documents relating to employee training materials regarding health service coordinator ("HSC") program, cardiac risk assessment program, and/or physician practice enhancement program;

21. Documents relating to presentations and/or training materials used to solicit patient referrals from physicians, and/or placement of HSCs in the physician's offices;

A magistrate judge took approximately two hours to review the government's affidavit and proposed warrant. He ultimately concluded that probable cause existed for the search and agreed to issue the proposed search warrant, on the condition that both the affidavit and the search warrant be amended to include protections for patients' medical information. The government made the requested revisions, and the magistrate judge issued the warrant.

The day before the execution of the search warrant, Special Agent Raftery met with the forty-two agents who would make up the search team. She distributed copies of the affidavit and gave them time to read it. She then conducted a "verbal briefing," explaining the probable cause for the search warrant and "the items that [the search team was] searching for and the items to be seized." All members of the search team were to have the cellular phone number of Special Agent Raftery during the search.

The team executed the search early the following morning, on January 31, 2002. Upon arriving at the scene, Special Agent Raftery met with one of SDI's executive officers and delivered a copy of the search warrant, but not a copy of the affidavit because it had been sealed by the district court. The affidavit was, however, available to the members of the search team. Kaplan also received a copy of the warrant, and he consented to allow investigators to search an off-site storage warehouse used by SDI.

B

About three years after the search, a federal grand jury in the District of Nevada returned an indictment charging SDI,

22. Holter monitor tapes containing cardiac monitor data;

23. Documents relating to material that provides instructions or examples concerning the operation of the computer system, computer software, and/or related device; and

24. Rolodexes, address books and calendars.

Kaplan and Brunk with one count of conspiracy, in violation of 18 U.S.C. § 371—specifically conspiracy to commit health care fraud, in violation of 18 U.S.C. § 1347, and to provide illegal kickback payments, in violation of 42 U.S.C. § 1320a-7b(b); 124 counts of health care fraud, in violation of 18 U.S.C. § 1347; one count of illegal kickbacks, in violation of 42 U.S.C. § 1320a-7b(b); one count of conspiracy to commit money laundering, in violation of 18 U.S.C. §§ 1956(a)(1)(A)(i) and 1956(h); and three counts of attempting to evade or defeat taxes, in violation of 26 U.S.C. § 7201. Additionally, Kaplan and Brunk were each individually indicted for three and four counts, respectively, of attempting to evade or defeat taxes, in violation of 26 U.S.C. § 7201. The indictment also alleged three counts of forfeiture for the proceeds of health care fraud and money laundering, under 18 U.S.C. §§ 24, 982(a)(7), 982(a)(1), and 1347.

On December 2, 2005, SDI, Kaplan and Brunk (collectively "the defendants") filed a motion to suppress evidence obtained from the search warrant, arguing that the warrant was vague and overbroad in violation of the Fourth Amendment. On June 26, 2006, a magistrate judge entered a Findings and Recommendation, in which he recommended that the motion to suppress be granted in part.

On April 4, 2007, the district court adopted the magistrate judge's factual findings, but entered an order granting the defendants' motion to suppress in full rather than in part. The district court first held that Kaplan and Brunk had standing to challenge the search of SDI's business premises, because they "had significant ownership interests in SDI," "exercised a high level of authority over the operations of the company including the authority to set and control policy regarding access to SDI's business records and computer systems," "maintained offices at SDI's corporate headquarters and were present during the execution of the Search Warrant," and because SDI "maintained a level of security and confiden-

tially [sic] practices regarding its premises and records that one would reasonably expect of a health care provider."

The district court concluded that items 7, 9-13, and 24 of the search warrant were overbroad and lacked sufficient particularity because "[t]he search warrant did not limit these general categories of business documents and financial records to the seizure of records relating to the criminal activity described in the affidavit," and because they lacked "any time restriction." Similarly, the district court noted that items 2, 4, 8, and 19, of the search warrant were "borderline in acceptability," but nevertheless violated the Fourth Amendment because "some additional description could and should have been provided regarding these categories." Lastly, the district court concluded that the "good faith exception" did not apply in this case based on its conclusion that the affidavit was not incorporated into the warrant. Without the affidavit, the court concluded, the agents' reliance on the warrant alone was not objectively reasonable, since it "did not contain any description of the alleged criminal activity relating to the listed categories of documents."

On May 3, 2007, the United States timely sought an interlocutory appeal of the district court's order.

II

The government first argues that Kaplan and Brunk lack standing to challenge the search and seizure of materials from SDI's premises.[3] According to the government, their mere

---

[3]Wisely, the government does not argue that SDI itself lacks standing to challenge the underlying search and seizure. *See United States v. Leary*, 846 F.2d 592, 596 (10th Cir. 1988) ("[A] corporate defendant has standing with respect to searches of corporate premises and seizure of corporate records." (internal citation and quotation marks omitted)). We therefore only consider the Fourth Amendment standing of Kaplan and Brunk. Insofar as they do indeed lack standing, all evidence is admissible as to charges against them. By contrast, insofar as we affirm the district court's suppression of some evidence, such evidence will be inadmissible against SDI. Standing, therefore, makes a difference in this case.

ownership and management of SDI, and the steps SDI took to preserve the security of its business files, are inadequate to support the conclusion that Kaplan and Brunk personally had an expectation of privacy in the searched areas and seized materials. While "[i]t has long been settled that one has standing to object to a search of his office, as well as of his home," *Mancusi v. DeForte*, 392 U.S. 364, 369 (1968), this case presents the novel issue of the extent to which a business employee may have standing to challenge a search of business premises generally.

## A

**[1]** The Fourth Amendment ensures that "[t]he right of the people to be secure in their persons, houses, papers, and effects, against unreasonable searches and seizures, shall not be violated, and no Warrants shall issue, but upon probable cause, supported by Oath or affirmation, and particularly describing the place to be searched, and the persons or things to be seized." U.S. Const. amend. IV. A person has standing to sue for a violation of this particular "right of the people" only if there has been a violation "as to him," personally. *Mancusi*, 392 U.S. at 367. In other words, Fourth Amendment standing, unlike Article III standing, "is a matter of substantive [F]ourth [A]mendment law; to say that a party lacks [F]ourth [A]mendment standing is to say that *his* reasonable expectation of privacy has not been infringed." *United States v. Taketa*, 923 F.2d 665, 669 (9th Cir. 1991). This follows from the Supreme Court's famous observation that the Fourth Amendment "protects people, not places," *Katz v. United States*, 389 U.S. 347, 351 (1967).

**[2]** To show the government has violated his Fourth Amendment rights, an individual must have "a legitimate expectation of privacy in the invaded place," *United States v. Crawford*, 323 F.3d 700, 706 (9th Cir. 2003) (internal quotation marks and citations omitted). Defendants must demonstrate "a subjective expectation of privacy in the area

searched, and their expectation must be one that society would recognize as objectively reasonable." *United States v. Sarkisian*, 197 F.3d 966, 986 (9th Cir. 1999).

[3] As a logical extension of this approach, "[p]roperty used for commercial purposes is treated differently for Fourth Amendment purposes from residential property." *Minnesota v. Carter*, 525 U.S. 83, 90 (1998) (plurality opinion); *see also New York v. Burger*, 482 U.S. 691, 700 (1987) ("An expectation of privacy in commercial premises . . . is different from, and indeed less than, a similar expectation in an individual's home.").[4] Of course, individuals may still have a "reasonable expectation of privacy against intrusions by police" into their offices. *O'Connor v. Ortega*, 480 U.S. 709, 716 (1987) ("Within the workplace context, . . . an expectation [of privacy] in one's place of work is based upon societal expectations that have deep roots in the history of the Amendment." (internal quotation marks and citations omitted)). But, unlike the nearly absolute protection of a residence, the "great variety of work environments" requires analysis of reasonable expectations "on a case-by-case basis." *Id*. at 718.

---

[4]The government makes much of the related *Colonnade-Biswell* doctrine, under which an expectation of privacy is substantially limited where the premises searched is a business engaged in a "closely-regulated" industry. *Marshall v. Barlow's, Inc.*, 436 U.S. 307, 313 (1978) ("Certain industries have such a history of government oversight that no reasonable expectation of privacy . . . could exist for a proprietor over the stock of such an enterprise." (citing *United States v. Biswell*, 406 U.S. 311 (1972) (recognizing the exception in the firearms industry) and *Colonnade Catering Corp. v. United States*, 397 U.S. 72 (1970) (same in the liquor industry)). However, this doctrine applies only to administrative searches. *See United States v. Aukai*, 497 F.3d 955, 959 (9th Cir. 2007) (en banc); *cf. Griffin v. Wisconsin*, 483 U.S. 868, 877-78 (1987) (distinguishing the probable cause requirements for administrative searches and criminal searches of closely-regulated businesses). Accordingly, the government's reliance on *United States v. Chuang*, 897 F.2d 646 (2d Cir. 1990), which applied the doctrine in the context of the search of a bank building by the Office of Comptroller of Currency, is unavailing.

**[4]** Our precedents provide numerous guideposts, however. For starters, it is crucial to Fourth Amendment standing that the place searched be "given over to [the defendant's] exclusive use." *Schowengerdt v. General Dynamics Corp.*, 823 F.2d 1328, 1335 (9th Cir. 1987). We have thus held that mere access to, and even use of, the office of a co-worker "does not lead us to find an objectively reasonable expectation of privacy." *Taketa*, 923 F.2d at 671. By the same token, we have rejected managerial authority alone as sufficient for Fourth Amendment standing. In *United States v. Cella*, we held the corporate officer of a hospital, whom we described as the "de facto controlling force in [its] management," did not have standing to challenge the seizure of records from the hospital print shop. 568 F.2d 1266, 1270, 1283 (9th Cir. 1977). Even though the defendant "had access to and control of the print shop operations, his rights did not include any expectation of privacy over documents which were kept at the print shop premises but over which [he] did not show an independent possessory or proprietary interest." *Id.* at 1283.

**[5]** It thus appears that an employee of a corporation, whether worker or manager, does not, simply by virtue of his status as such, acquire Fourth Amendment standing with respect to company premises. Similarly, and notwithstanding the reference to "an independent . . . proprietary interest" in *Cella*, to be merely a shareholder of a corporation, without more, is also not enough.[5] As always, a reasonable expecta-

---

[5]The Second Circuit summarized this point memorably in language quoted heavily by this and other circuits:

> When a man chooses to avail himself of the privilege of doing business as a corporation, even though he is its sole shareholder, he may not vicariously take on the privilege of the corporation under the Fourth Amendment; documents which he could have protected from seizure, if they had been his own, may be used against him, no matter how they were obtained from the corporation. Its wrongs are not his wrongs; its immunity is not his immunity.

*Hill v. United States*, 374 F.2d 871, 873 (9th Cir. 1967) (quoting *Lagow v. United States*, 159 F.2d 245, 246 (2d Cir. 1946) (per curiam)).

tion of privacy does not arise *ex officio*, but must be established with respect to the person in question.

We took this approach in *United States v. Gonzalez*, in which we held that the directors of a small, family-run corporation had standing to challenge a wiretap in one of the company's buildings. That holding relied on the facts of the case:

> [W]e simply hold that because the [defendants] were corporate officers and directors who not only had ownership of the [premises] but also *exercised* full access to the building as well as managerial control over its day-to-day operations, they had a reasonable expectation of privacy over calls made on the premises.

412 F.3d 1102, 1117 (9th Cir. 2005) (emphasis added). Thus, in *Gonzalez* we focused on the close control that the owner-operators exercised over their small business, which happened to be family-run.

Kaplan and Brunk argue that *Gonzalez* supports their claim of Fourth Amendment standing, but their argument rests on an overbroad reading of our opinion. We explicitly tied the defendants' standing to the "nature of the location." *Id.* at 1116. The defendants exercised, in the context of "a small, family-run business housing only 25 employees at its peak," "managerial control over [the] day-to-day operations" of the office where the conversations the wiretap "seized" took place, they owned the building where the office was located, and they not only could access the office but actually "exercised full access to the building." *Id.* at 1116-17. In our detailed factual analysis, therefore, we made clear that it does not suffice for Fourth Amendment standing merely to own a business, to work in a building, or to manage an office.

The facts in this case place SDI in a gray area outside the particular facts of *Gonzalez*, because at most Kaplan and

Brunk managed and worked in the office of a business of which they were, together, controlling shareholders. SDI's headquarters is twice the size of the office at issue in *Gonzalez*. The magistrate judge's findings of fact, which the district court adopted, emphasize primarily two aspects of the role Kaplan and Brunk played at SDI. First, the magistrate judge noted that Kaplan and Brunk owned and had authority to set policy at SDI. He also pointed out that, in their directorial capacities, they put in place significant security measures at SDI's headquarters. These facts show that SDI, through Kaplan and Brunk, took steps to protect the privacy of its headquarters. But the magistrate judge's findings do not show that Kaplan and Brunk personally managed the operation of the office on a daily basis, only that they set its general policy as officers of SDI. Because Kaplan and Brunk personally exercised less control over the premises in question than did the defendants in *Gonzalez*, that precedent does not control here.

Thus, although our precedents provide a basic outline, we are left with little case law directly on point. Exclusive use of an office may be sufficient, *Schowengerdt*, 823 F.2d at 1335 and *Mancusi*, 392 U.S. at 369, but *Gonzalez* illustrates that it is not necessary. Between the lines these three cases draw, it is unclear in which premises and materials belonging to a corporation a corporate employee has a legitimate expectation of privacy. One of our sister circuits, however, has crafted a balancing test that we believe helps to fill in the gap.

In *United States v. Anderson*, the Tenth Circuit laid out a test to deal with situations in which a corporate employee does not work on a regular basis in the area searched. *See* 154 F.3d 1225, 1230-32 (10th Cir. 1998). Given our case law, *Anderson* suggests three factors a court should consider in cases where an employee has not established that the area searched is "given over to [his] exclusive use." *See Schowengerdt*, 823 F.2d at 1335. The Tenth Circuit's *Anderson* test looks to "(1) the employee's relationship to the item

seized; (2) whether the item was in the immediate control of the employee when it was seized; and (3) whether the employee took actions to maintain his privacy in the item."[6] *Anderson*, 154 F.3d at 1232.

Though phrased vaguely, the first factor really addresses whether the item seized was personal property without any relationship to work. *Id.* at 1231 (noting that although "[o]wnership of an item does not confer automatic standing[,] . . . property ownership is a factor to be considered in determining whether an individual's Fourth Amendment rights have been violated" (internal quotation marks and citation omitted)). In addition, we note that the third factor involves actions the employee takes on his own behalf, not as an agent of the corporation. *See id.* at 1232; *see also O'Connor*, 480 U.S. at 716 (noting that an employee has a reasonable expectation of privacy in the contents of *closed* personal luggage in his office) (emphasis added); *United States v. Mancini*, 8 F.3d 104, 110 (1st Cir. 1993) (emphasizing that the defendant "took steps to assure that no one would have access to his files without his prior authorization [and] . . . that [his] belongings were clearly labeled and were segregated from other items in the secured archive attic.").

**[6]** Reading *Anderson* alongside our own precedent, we conclude that, except in the case of a small business over which an individual exercises daily management and control, an individual challenging a search of workplace areas beyond his own internal office must generally show some personal connection to the places searched and the materials seized. To adapt *Anderson*, although all the circumstances remain relevant, we will specifically determine the strength of such personal connection with reference to the following factors: (1)

---

[6]We note that *Anderson* did not limit the analysis to these three factors. Indeed, the Tenth Circuit stated that it would consider "all of the relevant circumstances," which included the three factors which we find instructive in this case. *Anderson*, 154 F.3d at 1232.

whether the item seized is personal property or otherwise kept in a private place separate from other work-related material;[7] (2) whether the defendant had custody or immediate control of the item when officers seized it; and (3) whether the defendant took precautions on his own behalf to secure the place searched or things seized from any interference without his authorization.[8] Absent such a personal connection or exclusive use, a defendant cannot establish standing for Fourth Amendment purposes to challenge the search of a workplace beyond his internal office.

## B

[7] The district court relied on three facts in concluding that Kaplan and Brunk had Fourth Amendment standing: their ownership of SDI, their management of SDI from offices in the building searched, and the security measures SDI took to secure its business records. Our review of relevant precedent indicates that these facts are too broad and generalized to support the district court's conclusion. The security measures that SDI took to ensure the privacy of its business records are rele-

---

[7]In light of the Supreme Court's opinion in *O'Connor*, it cannot suffice for Fourth Amendment standing to challenge the seizure of an item in the workplace that the item is the personal property of an individual. *See* 480 U.S. at 715-16 (noting that "[t]he workplace includes those areas and items that are related to work and are generally within the employer's control," such as "the hallways, cafeteria, offices, desks and file cabinets," "even if the employee has placed personal items in them, such as a photograph placed in a desk"). Therefore, though personal ownership is important, Supreme Court precedent precludes us from considering it sufficient by itself to confer standing in this context.

[8]We add that this list of factors is not exclusive, though it indicates *what kind* of factors are relevant. The law of Fourth Amendment standing in general, *see Katz,* 389 U.S. at 351; *Taketa*, 923 F.2d at 669, and of our cases on employee standing in particular, *see Gonzalez*, 412 F.3d at 1116-17; *Cella*, 568 F.2d at 1282-84; *Hill*, 374 F.2d at 872-73, emphasize that a defendant must show a personal connection to the place searched and item seized; therefore we will only consider factors that relate to such inquiry.

vant only to the standing of the corporation itself, not of its officers. As for Kaplan and Brunk, their ownership and management do not necessarily show a legitimate expectation of privacy. *See Hill*, 374 F.2d at 873; *Cella*, 568 F.2d at 1283. Because neither claims to enjoy "exclusive use" of the places searched—that is, the entire SDI office—they each must show a personal connection, along the lines we have drawn out of *Anderson*, to justify an expectation of privacy.

**[8]** Lacking precedent on what is admittedly a novel issue of law, the district court did not adequately develop the record. Therefore, the district court's grant of the motion to suppress must be reversed and the matter remanded for further fact-finding. It seems that none of the items seized were the personal property of Kaplan or Brunk, nor were they in the custody of either. Therefore, on remand, the district court should focus its inquiry on, but need not confine it to, whether either Kaplan or Brunk took measures, each on his or the pair's personal behalf, to keep the items private and segregated from other general business materials. Of course, Kaplan and Brunk do have standing to challenge the admission of any evidence obtained from their own personal, internal offices.

## III

Regardless of whether Kaplan and Brunk have Fourth Amendment standing, the government does not challenge the standing of SDI itself. We therefore discuss the merits of SDI's challenge to the search, which focuses on the warrant. SDI challenges the warrant as overbroad and lacking particularity.

## A

**[9]** Before addressing its contentions on the merits, we must answer the threshold question of whether the warrant incorporated Special Agent Raftery's affidavit. *See United*

*States v. Towne*, 997 F.2d 537, 544 (9th Cir. 1993) ("Only after the content of 'the search warrant' is established . . . can the warrant be tested to see if it meets [the Fourth Amendment's] requirements."). If it was incorporated, then we evaluate the affidavit and the warrant as a whole, allowing the affidavit to "cure" any deficiencies in the naked warrant. *Id.*

We consider an affidavit to be part of a warrant, and therefore potentially curative of any defects, "only if (1) the warrant expressly incorporated the affidavit by reference and (2) the affidavit either is attached physically to the warrant or at least accompanies the warrant while agents execute the search." *United States v. Kow*, 58 F.3d 423, 429 n.3 (9th Cir. 1995) (applying requirements with respect to overbreadth of a warrant); *see also United States v. Vesikuru*, 314 F.3d 1116, 1120 (9th Cir. 2002) (applying requirements with respect to the lack of particularity of a warrant).

Our analysis proceeds with the understanding that "[t]he warrant requirement is a means of preventing arbitrary and unreasonable invasions of privacy;" furthermore, "the search warrant itself is the tangible evidence that precautions have been taken to ensure that no such invasion has occurred." *Towne*, 997 F.2d at 548. The goal of the "cure by affidavit" rule is to consider those affidavits that limit the "discretion of the officers executing the warrant." *Id.* at 545 (internal quotation marks omitted). The two requirements of the rule, therefore, are designed to ensure that a would-be curative affidavit fulfilled that function. *Id.* at 548 ("When the officer who requests authorization for the search, the magistrate who grants such authorization, and the officers who execute the search expressly rely upon a given set of papers containing a given series of words, they identify *that* set of papers and *that* series of words as the proof that proper precautions were taken to prevent an unreasonably invasive search. Fairness and common sense alike demand that we test the sufficiency of the precautions taken . . . by examining *that* evidence.").

1

**[10]** A warrant expressly incorporates an affidavit when it uses " 'suitable words of reference.' " *See id.* at 545 (quoting *United States v. Hillyard*, 677 F.2d 1336, 1340 (9th Cir. 1982)). We have not defined precisely what verbiage is suitable for this purpose, *Vesikuru*, 314 F.3d at 1120 (noting that "[n]one of our cases has addressed what 'suitable words of reference' are required"); indeed "there are no required magic words of incorporation." *Id.* at 1121. However, in *Vesikuru*, we held that "suitable words of reference" were used where the "warrant explicitly stated: '*Upon the sworn complaint made before me* there is probable cause to believe that the [given] crime[ ] . . . has been committed.' " *Id.* at 1120 (emphasis in original).

**[11]** Such holding proves relevant to this case, because virtually the same language was used in the search warrant here. The warrant pointed to the affidavit explicitly, noting "the supporting affidavit(s)" as the "grounds for application for issuance of the search warrant." The magistrate judge's conclusion—which the district court adopted—that these were not suitable words of reference rested on his observation that the government "could and should" have used more precise language in this case. But our precedents do not require that the government use the most precise language of reference possible. Such language need only be "suitable." *See id.* at 1121. In any event, the warrant in *Vesikuru* might also have contained more explicit wording, but we still held the language of reference in that case to suffice. Thus the similarity of the language of reference in *Vesikuru* compels our holding that the warrant here contained suitable language of reference to the affidavit and therefore expressly incorporated it.

The defendants argue that *Vesikuru* is distinguishable, because there we stated that "we learned at oral argument that in Washington State, contrary to the practice we usually see in federal court, the issuing judge routinely attaches the sup-

porting affidavit, or 'sworn complaint,' to the warrant, and that the issuing judge and the officers executing the warrant view the warrant and affidavit as one integrated document." *Vesikuru*, 314 F.3d at 1120. However, we do not read this passage as affecting the suitability of the words of reference. Although *Vesikuru* does not explicitly separate the two requirements, the passage is only logically applicable to the second prong of the *Kow* test, that "the affidavit either [be] attached physically to the warrant or at least accompan[y] the warrant while agents execute the search." 58 F.3d at 429 n.3.[9]

2

**[12]** With respect to the second prong, there appears to be no question that Special Agent Raftery and the search team had copies of the affidavit in their possession when they executed the warrant. Although it is unclear whether each member of the team had his own copy as he conducted the search,

---

[9]Our opinion in *United States v. Bridges*, 344 F.3d 1010 (9th Cir. 2003), does not require a contrary result. In *Bridges*, an Attachment to the warrant mentioned the associated affidavit: "Based on the facts as presented in the Affidavit for Search Warrant. . . ." *Id.* at 1017. When later considering whether the affidavit could cure the warrant's failure to describe the specific criminal activity suspected by the government, the panel noted, without any discussion, that "the warrant neither incorporates the Affidavit by reference, nor is a copy of the Affidavit physically attached to the warrant or any of its incorporated parts." *Id.* at 1018. Because the affidavit also failed the second prong of *Kow* in that it was not attached to or did not accompany the warrant, any determination regarding incorporation was not necessary to the result in *Bridges*. Moreover, unlike *Vesikuru*, *Bridges* contains absolutely no discussion or analysis regarding suitable words of incorporation, perhaps because in *Bridges* it was an attachment to the warrant which referenced the affidavit rather than the warrant itself. We cannot know for sure because of the cursory nature of the conclusion that there was no incorporation. As we have explained, "not every statement of law in every opinion is binding on later panels. Where it is clear that a statement is made casually and without analysis . . . or where it is merely a prelude to another legal issue that commands the panel's full attention, it may be appropriate to re-visit the issue in a later case." *United States v. Johnson*, 256 F.3d 895, 915 (9th Cir. 2001) (en banc).

the magistrate accepted Special Agent Raftery's representation that "the affidavit was available during the search for reference by any member of the Government's search team." By making the affidavit available, the search team ensured that it "accompanied the warrant" to satisfy the requirements of incorporation. Nothing more is necessary for the affidavit to ensure "that the discretion of the officers executing the warrant is limited." *Towne*, 997 F.2d at 548 (internal quotation marks omitted).[10]

SDI argues that the failure of the search team to give a copy of the affidavit to the defendants—which the government concedes—means that the affidavit did not "accompany" the warrant for purposes of this inquiry. Certainly some of our precedents have held that the "purpose of the accompanying affidavit . . . is both to limit the officer's discretion and to inform the person subject to the search what items the officers executing the warrant can seize." *United States v. McGrew*, 122 F.3d 847, 850 (9th Cir. 1997) (internal citation and quotation marks omitted and emphasis removed); *see also Towne*, 997 F.2d at 548. Eliminating any doubt on this score, we held, in *United States v. Grubbs*, that "our prior cases unambiguously require officers to present any curative document . . . to the persons whose property is to be subjected to the search." 377 F.3d 1072, 1078-79 (9th Cir. 2004), *rev'd by United States v. Grubbs*, 547 U.S. 90 (2006).

---

[10]We have long since dispelled any lingering confusion in our case law that the affidavit must be physically affixed to the search warrant. *Towne*, 997 F.2d at 544-48. We have also clarified that "[t]he documents that are in fact relied upon to serve [the functions of a search warrant] simply *are* the 'search warrant' for purposes of constitutional analysis." *Id.* at 548 (addressing the accompaniment requirement). It is true that the magistrate judge questioned how much the search team actually relied on the affidavit to limit its search. As we discuss below, this was in the context of the good faith exception, where the procedural posture in the district court was different. In addition, we have never required actual reliance on an affidavit to meet the second prong for incorporation into a warrant.

**[13]** However, the Supreme Court overruled our decision. *Grubbs*, 547 U.S. at 98-99. The Court explained that "[t]he Constitution protects property owners not by giving them license to engage the police in a debate over the basis for the warrant, but by interposing, *ex ante*, the deliberate, impartial judgment of a judicial officer between the citizen and the police, and by providing, *ex post*, a right to suppress evidence improperly obtained and a cause of action for damages." *Id.* at 99 (internal quotation and punctuation marks and citation omitted). Because the Supreme Court has rejected our previous position, SDI's argument that the Fourth Amendment required the search team to provide all defendants a copy of the affidavit fails.[11] We therefore conclude that the warrant did incorporate the affidavit.

## B

Evaluating the warrant (including the affidavit) to determine whether it met the demands of the Fourth Amendment, we start with the relevant language, which, of course, provides that "no Warrants shall issue, but upon probable cause . . . and particularly describing the place to be searched, and the persons or things to be seized." U.S. Const. amend. IV. Our cases describe this requirement as one of "specificity" and we have distinguished its "two aspects": "particularity and breadth. . . . Particularity is the requirement that the warrant must clearly state what is sought. Breadth deals with the requirement that the scope of the warrant be limited by the probable cause on which the warrant is based." *In re Grand Jury Subpoenas Dated Dec. 10, 1987*, 926 F.2d 847, 856-57 (9th Cir. 1991) (internal citations omitted).

---

[11]Of course, nothing in this opinion affects the *statutory* obligation of the searching agents to leave a copy of the warrant and a receipt for property taken with "the person from whom, or from whose premises, the property was taken, or . . . [left] where the officer took the property." Fed. R. Crim. P. 41(f)(1)(C). Defendants did not raise Rule 41(f) in their brief on appeal.

1

Particularity means that "the warrant must make clear to the executing officer exactly what it is that he or she is authorized to search for and seize." *Id.* at 857. " 'The description must be specific enough to enable the person conducting the search reasonably to identify the things authorized to be seized.' " *United States v. Smith*, 424 F.3d 992, 1004 (9th Cir. 2005) (alteration removed) (quoting *United Sates v. Spilotro*, 800 F.2d 959, 963 (9th Cir. 1986)). "However, the level of detail necessary in a warrant is related to the particular circumstances and the nature of the evidence sought." *United States v. Adjani*, 452 F.3d 1140, 1147 (9th Cir. 2006). Indeed, "[w]arrants which describe generic categories of items are not necessarily invalid if a more precise description of the items subject to seizure is not possible." *Spilotro*, 800 F.2d at 963.

**[14]** Particularity is not the problem with the warrant in this case. Even the most troubling items on the list, such as "[r]olodexes, address books and calendars," are particular in that they "enable the person conducting the search reasonably to identify the things authorized to be seized." *Smith*, 424 F.3d at 1004 (internal quotation marks omitted). The officers could tell from the warrant that, should they happen upon a rolodex, they should seize it. Because the warrant was not vague as to what it directed law enforcement officers to search for and to seize, we are satisfied that it did not lack particularity for Fourth Amendment purposes.

The district court only made one inquiry, which explicitly conflated particularity and overbreadth. The court found that the warrant "at issue here was unconstitutionally overbroad because the lack of particularity provided no guidance in limiting the search and no direction to government agents regarding the purpose of the search or what types of records were within its scope." This error is quite understandable, given that some of our own opinions have been unclear on the difference between particularity and overbreadth. However, we

now insist that particularity and overbreadth remain two distinct parts of the evaluation of a warrant for Fourth Amendment purposes.

2

a

A warrant must not only give clear instructions to a search team, it must also give legal, that is, not overbroad, instructions. Under the Fourth Amendment, this means that "there [must] be probable cause to seize the particular thing[s] named in the warrant."[12] *In re Grand Jury Subpoenas*, 926 F.2d at 857. "[P]robable cause means a fair probability that contraband or evidence of a crime will be found in a particular place, based on the totality of circumstances." *United States v. Diaz*, 491 F.3d 1074, 1078 (9th Cir. 2007) (internal quotation marks omitted); *see United States v. Gourde*, 440 F.3d 1065, 1069 (9th Cir. 2006) (en banc) ("[P]robable cause means 'fair probability,' not certainty or even a preponderance of the evidence."). "The number of files that could be scrutinized . . . is not determinative. The search and seizure of large quantities of material is justified if the material is within the scope of the probable cause underlying the warrant." *United States v. Hayes*, 794 F.2d 1348, 1355 (9th Cir. 1986).

---

[12]Although we have historically preferred that a warrant describe the specific crimes of which the government suspects the defendants, *see e.g.*, *Kow*, 58 F.3d at 427, the Supreme Court's recent *Grubbs* opinion may affect that preference. *Grubbs*, 547 U.S. at 98 (internal quotation marks omitted) (observing that the Fourth Amendment "specifies only two matters that must be 'particularly describ[ed]' in the warrant: 'the place to be searched' and 'the persons or things to be seized[;]' [and that the Court has] previously rejected efforts to expand the scope of this provision to embrace unenumerated matters"). We decline to consider here the effect of this language because the warrant incorporated the affidavit, which *did* describe the specific crimes the government suspected the defendants of committing.

b

We turn now to the specific items with respect to which the district court found the warrant invalid, keeping in mind the warrant's incorporation of the affidavit. First, the district court, adopting the findings and recommendations of the magistrate judge, pointed to four categories of materials that it concluded were "borderline in acceptability," but nevertheless invalid:

> 2.  Documents relating to billing procedures, billing manuals, and billing materials.
>
> 4.  Documents relating to billing records and records of payments received.
>
> 8.  Documents relating to correspondence with Medicare intermediaries and private insurance companies.
>
> 19.  Documents relating to mailing and shipping records between physicians and SDI.

The magistrate judge recognized that "SDI's entire business appears to have been the conducting of sleep studies, and the affidavit supported the conclusion that SDI's allegedly fraudulent conduct was routine."[13] All the same, he concluded

---

[13]The government does not expressly challenge the magistrate judge's conclusion that the "permeated with fraud" exception does not apply in this case, but it cites and applies cases setting forth such principle. To dispel any uncertainty, we confirm that the exception does not apply to this case. We have held that "[a] generalized seizure of business documents may be justified if the government establishes probable cause to believe that the entire business is merely a scheme to defraud or that all of the business's records are likely to evidence criminal activity." *Kow*, 58 F.3d at 427. However, in this case the affidavit did not allege that SDI's entire business was fraudulent, and therefore such exception is inapplicable. *See Ctr. Art Galleries-HI, Inc. v. United States*, 875 F.2d 747, 751 (9th Cir.

that these categories were "overbroad and vague . . . and not adequately limited to seizure of documents relating to the fraudulent scheme under investigation."

In light of the warrant's incorporation of the affidavit, we reject this conclusion. According to the affidavit, SDI's entire business involved sleep studies, and billing for phony sleep studies lay at the core of its scheme. There was probable cause, therefore, to support Category 2, in that any and all documents related to billing practices would have information relevant to whether SDI trained its employees to commit fraud or otherwise engaged in fraudulent billing. The same applies to Category 8. While the magistrate judge faulted the government for failing to specify that it sought "billing and payments for sleep studies," such criticism relied on the non-incorporation of the affidavit into the warrant. Including the affidavit as part of the warrant moots this concern. The affidavit also alleged that SDI engaged in both tax fraud and Medicare fraud, providing probable cause to support the seizure of all documents within the purview of category 4. Finally, in light of the government's allegation that SDI was engaging in mail fraud and providing illegal kickback payments to referring physicians, we conclude that Category 19 adequately limited the search to documents related to the mailing and shipping records with physicians (i.e., as opposed to allowing the seizure of all mailing and shipping records).[14] It did not have to be any more restrictive.

---

1989) ("[T]o qualify . . . the government must make the required showing *in obtaining* the search warrant."); *see also United States v. Bridges*, 344 F.3d 1010, 1018 (9th Cir. 2003) (noting that the exception "may be justified if the Government's supporting affidavit made it clear that the target business's central purpose was to serve as a front for defrauding investors," and relying on the fact that "[h]ere, the IRS did not allege in its application that [the suspect's] operations were permeated with fraud" (internal quotation marks omitted)).

[14]We note that the section of the affidavit setting forth the facts establishing probable cause discusses SDI's fraudulent conduct in detail, but

The magistrate judge also pointed to seven categories that, he believed, more clearly violated the Fourth Amendment:

    7.    Documents relating to non-privileged correspondence with consultants.

    9.    Documents relating to non-privileged internal memoranda and E-mail.

   10.    Documents relating to bank accounts, brokerage accounts, trusts.

   11.    Checking, savings, and money market account records, including check registers, cancelled checks, monthly statements, wire transfers, and cashier's checks.

   12.    Documents relating to personnel and payroll records.

   13.    Documents relating to accounting records.

   24.    Rolodexes, address books and calendars.

Certainly, the district court had better justification finding these categories invalid under the Fourth Amendment. Indeed, we disagree with the district court only with respect to Categories 7 and 13.

Category 7 involves the "non-privileged correspondence of consultants." Consultants are contract counter-parties outside

---

never explicitly alleges that SDI used mail or wire communications in committing such fraud. Nevertheless, we believe that there was a "fair probability" that such communication occurred in the course of SDI's fraudulent scheme—and thus that probable cause supported the allegation of mail fraud. *See Diaz*, 491 F.3d at 1078 ("People draw 'reasonable' conclusions all the time without direct evidence. Indeed, juries frequently convict defendants of crimes on circumstantial evidence alone.").

of a firm who assist it with one or another part of its business. Since, again, SDI's entire business involved sleep studies, it would have been difficult to specify beforehand which consultants were complicit in the fraudulent sleep studies.

[15] Category 9, on the other hand, makes no attempt to limit the search team's reach to internal memoranda related to the sleep studies. Since internal documents typically cover a subject-matter far wider than do external communications, this failure constitutes an invitation to a general, "exploratory rummaging in a person's belongings." *United States v. Holzman*, 871 F.2d 1496, 1508 (9th Cir. 1989), *overruled on other grounds by Horton v. California*, 496 U.S. 128 (1990) (internal citations and quotation marks omitted). It is true that the affidavit stated that "SDI likely will have contracts, memoranda, Email and/or other documents explaining the relationship between SDI and [cardiac diagnostic companies] and the reasons for . . . payments." But even though we find the warrant incorporated the affidavit, this does not mean that every chance remark buried in its thirty-five pages can cure plain defects in the warrant.

[16] Categories 10, 11, and 12 pose a similar problem. Companies keep documents relating to the bank and checking accounts or other financial information of most of their employees. In other words, by failing to describe the crimes and individuals under investigation, the warrant provided the search team with discretion to seize records wholly unrelated to the finances of SDI or Kaplan. *See Kow*, 58 F.3d at 427 ("[G]eneric classifications in a warrant are acceptable only when a more precise description is not possible." (internal citation and quotation marks omitted)); *see also Ctr. Art Galleries-HI*, 875 F.2d at 750 (holding that, where investigators believed that an art gallery was selling forged Dali artwork, the warrant should have limited the search "to items pertaining to the sale of Dali artwork").

Although SDI's entire business revolved around sleep studies, that does not mean, and no one has suggested, that its

entire business was a sham. As we noted above, the "permeated with fraud" exception to the specificity requirements of the warrant does not apply here. This makes Category 13 problematic. However, especially considering the allegations that SDI engaged in tax fraud by understating its earnings, it would be difficult to distinguish in the warrant between those records which would provide evidence of the alleged fraud and those that would not. Category 13, then, more closely resembles Category 4 rather than Categories 10-12. That is to say, the only accounting records companies typically keep are those of their business dealings; they do not keep accounting records of their employees' personal finances. Since SDI's entire business involved sleep studies, all of its accounting records could potentially reveal evidence of the alleged fraud.

**[17]** Finally, Category 24—SDI's rolodexes, address books, and calendars—amounts to the laziest of gestures in the direction of specificity. Again, this category practically begs the search team to find and to seize the contact information of every person who ever dealt with SDI. It would have been far more sensible, as well as constitutional, to limit the search to information relating to consultants, physicians, and health insurance companies, or some other group likely to turn up conspirators in the alleged fraud. *See United States v. Hill*, 459 F.3d 966, 975 (9th Cir. 2006) ("[A]lthough the warrant in this case authorized a wholesale seizure, the supporting affidavit did not explain why such a seizure was necessary.").

**[18]** We therefore conclude that Categories 9, 10, 11, 12, and 24 were overbroad because "probable cause [did not] exist[ ] to seize all items of [those] particular type[s]." *Adjani*, 452 F.3d at 1148 (internal quotation marks and citations omitted).

### IV

The government has one last redoubt, to which we now turn: the good faith reliance exception.

"[I]n *United States v. Leon*, the Supreme Court set out an exception to the exclusionary rule for a search conducted in good faith reliance upon an objectively reasonable search warrant." *United States v. Crews*, 502 F.3d 1130, 1135-36 (9th Cir. 2007) (citing *United States v. Leon*, 468 U.S. 897, 925 (1984)). "Working from the premise that the exclusionary rule is a judicially created, as opposed to constitutionally required, remedy for Fourth Amendment violations, the Court reasoned that where police conduct is pursued in complete good faith, the rule's deterrent function loses much of its force." *United States v. Luong*, 470 F.3d 898, 902 (9th Cir. 2006) (internal quotation marks omitted). When it invokes the exception, the government bears the burden of proving that officers relied on the search warrant "in an objectively reasonable manner." *Crews*, 502 F.3d at 1136; *Luong*, 470 F.3d at 902 ("[T]he good faith test is an objective one."); *see also United States v. Michaelian*, 803 F.2d 1042, 1048 (9th Cir. 1986).

We have recognized that, where a warrant is defective without incorporating a supporting affidavit, the good faith exception may still apply. *See United States v. Luk*, 859 F.2d 667, 677 (9th Cir. 1988) ("The twenty-two page affidavit . . . provided the particularity that the warrant lacked . . . In this case, the affidavit did act as this sort of limit on the search."). However, the government must show that the officers who executed the search actually relied on the affidavit. *Id.*; *see also Michaelian*, 803 F.2d at 1048.

In *Luk*, while it was "unclear from the record whether the affidavit was actually in hand during the search," we noted that the affiant was present at the scene, "and the agents specifically relied on the affidavit in determining at the scene what items were properly within the scope of the search." *Luk*, 859 F.2d at 677 and n.10. Here, the record does show that Special Agent Raftery, the affiant, had her search team read her affidavit, briefed the team on its contents and what items they were to search for, and was present during the

search. These compelling facts, however, do not trump our precedent that the *Luk* good faith exception does not apply where the searching officers do not "actually rel[y]" on the affidavit. *Kow*, 58 F.3d at 429 ("[U]nlike the facts in *Luk*, there is absolutely no evidence in this case that the officers who executed the warrant, although instructed to read the affidavit, actually relied on the information in the affidavit to limit the warrant's overbreadth.").

**[19]** It is, again, the government's burden to show that this occurred. In this connection, we note that in *Luk*, the procedural posture was significantly different than it is in this case. There, the district court had found that the good faith exception did apply and that the officers had relied on the affidavit in executing it. 859 F.2d at 670. The opposite is the case here. The magistrate judge in this case found that there was "[n]o evidence . . . that the agents in fact relied on the affidavit to restrict their search." The government has pointed to no evidence the magistrate judge overlooked that would show there was any clear error. Accordingly, we conclude that the *Luk* exception cannot apply here.

V

Having concluded that five of the twenty-four categories of materials listed in the search warrant were unconstitutionally overbroad and that no exception rescues them from suppression, we turn to the question of the appropriate remedy. Specifically, we review whether the district court was correct to suppress all the evidence obtained in the search, as opposed to severing violative portions of the warrant from the valid ones, and suppressing only the evidence obtained pursuant to the former.

We have endorsed a doctrine of severance, "which allows a court to strike from a warrant those portions that are invalid and preserve those portions that satisfy the [f]ourth [a]mendment. . . . We have previously allowed severance

when a warrant lacked particularity because of some unduly broad language in the warrant." *United States v. Sears*, 411 F.3d 1124, 1129 (9th Cir. 2005) (internal quotation marks and citations omitted). "Total suppression, on the other hand, is appropriate when a warrant is wholly lacking in particularity." *Id*.

In general, we do not allow severance or partial suppression "when the valid portion of the warrant is a relatively insignificant part of an otherwise invalid search." *Kow*, 58 F.3d at 428 (internal citation and quotation marks omitted); *see also In re Grand Jury Subpoenas*, 926 F.2d at 858 (allowing severance where "the warrants were overbroad as to only nine of the twenty-two persons or entities named," and where "documents of the persons or entities for which there was probable cause constituted the focus, and the vast majority, of the files searched"). Here, the magistrate found that the portion of the warrant he believed was valid—a smaller piece than that which we have approved—was "a principal portion" of the evidence the Government sought and was "not a relatively insignificant" part of the warrant.

[20] Although the district court adopted this finding, it oddly granted total suppression in this case. The district court apparently saw a resemblance between the facts in this case and those in cases where we have refused to sever a partially invalid warrant, such as *United States v. Cardwell*, 680 F.2d 75 (9th Cir. 1982), *Spilotro*, and *Kow*. However, the violations in this case are not nearly as egregious as those we found in those earlier cases, where we held that all or nearly all the categories of items to be seized were defective. *See Cardwell*, 680 F.2d at 76, 78-79 ("In this case even the most specific descriptions . . . are fairly general."); *Spilotro*, 800 F.2d at 964-65 (noting that "the government could have narrowed most of the descriptions in the warrant[ ]" and expressly relying on the conclusion that "the descriptions found deficient in *Cardwell* were at least as precise as the descriptions at issue here"); *Kow*, 58 F.3d at 427 ("By failing

to describe with any particularity the items to be seized, the warrant is indistinguishable from the general warrants repeatedly held by this court to be unconstitutional."). Here, the violative categories concerned only a specific subset of items—i.e., rolodexes, address books, calenders, certain financial documents, payroll and personnel records, and internal correspondence—and the lion's share of the categories did not violate the Fourth Amendment. This is not a case where "the officers, in effect, conducted a warrantless search," *Sears*, 411 F.3d at 1130 (internal quotation marks omitted), and therefore the district court should have granted partial suppression.

## VI

**[21]** Finally, we consider whether Todd Kaplan's consent to search the off-site facility was voluntary, an issue the district court did not reach. Consent received during an illegal search is suppressed as fruit of the poisonous tree "unless subsequent events have purged the taint." *United States v. Chavez-Valenzuela*, 268 F.3d 719, 727 (9th Cir. 2001), *amended by* 279 F.3d 1062 (9th Cir. 2002). In this case, however, the search was not wholly illegal. The defendants rely on *United States v. Hotal*, 143 F.3d 1223, 1228 (9th Cir. 1998), but in that case we suppressed all the evidence obtained pursuant to the warrant. We therefore remand the case to the district court on this issue to determine to what extent the consent of Todd Kaplan was tainted by those aspects of the search that violated the Fourth Amendment.

## VII

For the foregoing reasons, the decision of the district court is AFFIRMED in part, REVERSED in part, and REMANDED for further proceedings consistent with this opinion.